**Audra BEASLEY, individually and on behalf of all other similarly situated, Plaintiff,**

v.

**ALABAMA STATE UNIVERSITY, et al., Defendants.**

**Civil Action No. 96–T–473–N.**

United States District Court,
M.D. Alabama,
Northern Division.

April 28, 1998.

**1328**

State University (ASU), filed this lawsuit on March 15, 1996, claiming that ASU, through its trustees and various officers, was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681 et seq., and its implementing regulations, 34 C.F.R. §§ 106.38, 106.41, as well as the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983. By orders entered on March 27 and June 9, 1997, this court dismissed a number of claims and defendants, ruling that ASU may be sued under Title IX, and that other individually-named, current officers of ASU may be sued in their official capacities for injunctive relief under Title IX and the fourteenth amendment. *See Beasley v. Alabama State Univ.,* 966 F.Supp. 1117 (M.D.Ala.1997).

On August 7, 1997, the defendants filed a motion for summary judgment as to all remaining claims in the case. In addition to their contention that summary judgment should be granted as to these claims on their merits, the defendants asserted that all Title IX claims against ASU and any remaining monetary claims against the individual defendants under Title IX are barred by the immunity granted by the eleventh amendment to the United States Constitution. On September 15, 1997, the court notified the Attorney General of the United States, pursuant to 28 U.S.C.A. § 2403(a) and Federal Rule of Civil Procedure 24(c), of this challenge to the constitutionality of Title IX, and on October 28, 1997, the United States filed a complaint-in-intervention in this action to defend the constitutionality of Title IX.

By order entered October 28, 1997, the court denied the defendants' motion for summary judgment as premature to the extent that the defendants sought adjudication on the merits of Beasley's claims. However, by order entered March 23, 1998, the court ruled on the legal issues raised by the defendants' contention that Beasley's Title IX claims were barred by the eleventh amendment, finding that her claims were not so barred. *See Beasley v. Alabama State Univ.,* —— F.Supp. ——, 1998 WL 136119 (M.D.Ala. March 23, 1998), *supplement-*

Joseph (Jay) Brady Lewis, Montgomery, AL, Andy D. Birchfield, Jr., Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, AL, J. Bernard Brannan, Jr., Brannan & Guy, Montgomery, AL, for Plaintiff.

Solomon S. Seay, Jr., Mongomery, AL, Cynthia Williams Clinton, Mark Englehart, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for Defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Audra Beasley, a female student and former athlete at defendant Alabama

*ed,* —— F.Supp. ——, 1998 WL 229916 (M.D.Ala. April 28, 1998).

On January 22, 1998, the defendants filed a renewed motion for summary judgment as to all claims remaining in this lawsuit. This motion is presently before the court. For the reasons that follow, the court will grant the motion and dismiss Beasley's lawsuit in its entirety.

## I. BACKGROUND

The facts, viewed in the light most favorable to Beasley, the non-movant, are as follows. Beasley is a female student and skilled athlete who was recruited to attend and play volleyball at ASU by its volleyball coach, with the oral promise of an athletic scholarship. She enrolled at ASU and played volleyball in the fall of 1991, her first semester, but was then told she would not receive the promised scholarship because of a lack of funds allocated by ASU for women's volleyball. Even after she was denied a scholarship, Beasley continued to play on the women's team in the fall of 1991, but suffered a foot injury during an intercollegiate volleyball match that October, which injury was serious enough to require surgery. ASU continually refused to provide financial coverage for the surgery until December 1995, when it relented and paid for Beasley to have surgery.

Beasley's NCAA athletic eligibility expired in September 1996. Until that time, Beasley continued to have an interest in participating in varsity volleyball or other athletic programs at ASU.

According to Beasley, she would have qualified for and received the promised scholarship had funds for women's sports at ASU been allocated on a gender-equitable basis. In 1991, when Beasley was denied the promised scholarship, ASU did not grant athletic scholarships to student-athletes who participated in non-revenue generating sports, including women's volleyball. The sole sports for which such financial support was provided were football (a men's sport), men's basketball, and women's basketball. This policy was put into effect in 1985 by the ASU Board of Trustees due to budgetary constraints. As a direct consequence of this restriction of scholarship opportunities, according to Beasley, during the 1991–92 academic year there was an 11.90% disparity between the percentage of overall athletic scholarship assistance provided to women student-athletes and the percentage of total athletes at ASU who were women.

This disparity figure, which forms the basis of Beasley's surviving scholarship claim and therefore is central to the court's analysis, is calculated as follows. First, the total number of male and female athletes during the academic year is calculated. Next, from these figures, the percentage of total participants in athletics who are women is determined. Next, the total male and female athletic scholarship award funds are calculated, and from these figures is determined the percentage of such funds earmarked for female athletes. Finally, the percentage of total student-athletes who are female is compared to the percentage of total scholarship funds awarded to females, and any disparity is noted.

A negative disparity means that the percentage of total athletic scholarship funds awarded to women is less than the percentage of women participating in athletics.[1]

---

1. The 11.90% negative disparity figure for the 1991–92 academic year was calculated as follows:

| | |
|---|---|
| Number of female athletes: | 76 |
| Number of male athletes: | 224 |
| Total: | 300 |
| | |
| Percentage of total athletes who are women: | 76 ÷ 300 = 25.33% |
| | |
| Athletic scholarship funds awarded to men: | $ 266,109 |
| Athletic scholarship funds awarded to women: | 41,286 |
| Total: | $ 307,395 |

Correspondingly, such a negative disparity in the provision of female scholarship awards demonstrates that "male athletes, overall, receive dollar amounts of scholarship support, relative to their participation level in athletics, greater than women receive," as is required to establish a Title IX violation. *Beasley,* 966 F.Supp. at 1122–23.

According to the undisputed record, the negative disparity in scholarship support for female athletes has been as follows for remainder of Beasley's period of NCAA eligibility: 1992–93: 7.24%; 1993–94: 2.40%; 1994–95: 1.27%; 1995–96: 1.92%. The latest figures for ASU, from the 1996–97 academic year, show a 3.30% negative disparity.

In September 1993, Beasley filed a complaint against ASU under Title IX with the Office of Civil Rights ("OCR") of the United States Department of Education. The OCR's investigation, which was completed in 1995, focused on the 1993–94 academic year. The OCR concluded that the athletic financial assistance made available to men and women that year by ASU was substantially proportionate to the relative participation rates in the intercollegiate athletic program. However, the OCR found that ASU had failed to provide equal accommodation of women athletes' interests and abilities, and concluded that there were numerous other deficiencies in the university's provision of athletic facilities, training and services to women.

On March 15, 1996, Beasley filed the present lawsuit. Although she alleged in her complaint that male athletes who suffer injuries comparable to her foot injury receive relatively prompt treatment and financial support, while similarly-situated female athletes do not, she is no longer pursuing this theory of discrimination in her lawsuit, because she concedes that she cannot muster the evidence necessary to substantiate it.[2] Beasley also alleged in her complaint that she has experienced other disparities in treatment as a female athlete at ASU, including in the provision of practice facilities and coaching, and that ASU fails to provide equal opportunities for women to participate in varsity college athletics, and fails to accommodate the desires and abilities of its women athletes to participate in varsity sports. However, Beasley has abandoned these claims as well, stating that her concerns have been adequately addressed by the OCR in the wake of its investigation of ASU.[3]

Additionally, Beasley now presses her scholarship claim only with respect to her initial, 1991–92, academic year, and not the subsequent years for which she enjoyed NCAA eligibility. She presently seeks only equitable relief in the form of a back scholarship award, compensatory damages, as well as injunctive relief on behalf of others.

## II. MOTION–FOR–SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities of the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-

---

Percentage of scholarship
funds awarded to women: $ 41,286 \div $ 307,395 = 13.43\%$

Disparity: $25.33\% - 13.43\% = 11.90\%$

**2.** Plaintiff's brief in response to defendants' renewed motion for summary judgment, filed on February 12, 1998, at 1 n. 1.

**3.** *Id.*

moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

The defendants contend that summary judgment should be granted in their favor on multiple grounds. First, they argue that Beasley's claims are time-barred because she failed to file this lawsuit within the two-year limitations period imposed by the applicable statute of limitations. In so asserting, the defendants attempt to fend off any counter-argument that Beasley may invoke the so-called "continuing violations" doctrine to evade this bar, or that the limitations period must be tolled because Beasley elected to pursue available administrative grievance procedures prior to bringing the immediate lawsuit. Second, the defendants challenge Beasley's standing to pursue any claims for prospective relief against the university, in view of the fact that her NCAA eligibility has expired and no class has been certified in this action. Third, turning to the substance of Beasley's scholarship claim, the defendants assert that Beasley has failed to adduce sufficient evidence to establish that ASU has offered less-than-substantial equality in athletic scholarship assistance to male and female student-athletes in relation to their participation in intercollegiate athletics. Fourth, and finally, the defendants contend that even if Beasley succeeds in demonstrating that ASU has not satisfied the requisite substantial-equality standard, she cannot survive summary judgment because she has not proffered any evidence that suggests a causal connection between the alleged gender-based disparities and the denial of her athletic scholarship in 1991.

As explained more fully below, the court finds that Beasley's claim related to the denial of an athletic scholarship for the 1991–92 academic year is time-barred, and that she lacks standing to pursue her claim for prospective relief on behalf of herself and other women athletes at ASU. Therefore, there is no need to reach the other issues raised by the defendants, and the court will grant their motion for summary judgment.

### A. Statute–of–Limitations Bar

i.

As the court explained in its June 9, 1997, order, Beasley's claims are subject to the two-year statute of limitations found in § 6–2–38(i) of the 1975 Alabama Code. *See Beasley*, 966 F.Supp. at 1128. The defendants ask the court to revisit the question, addressed in the previous order, of whether Beasley's claims are time-barred under this statute of limitations. As shown below, Beasley's decision to abandon all of her non-scholarship claims, some of which alleged discriminatory conduct extending into the two-year limitations period, renders this question a significantly more subtle and complex one than it was when the court last addressed it.

In its previous order, the court rejected the defendants' statute-of-limitations argument because it found that all of Beasley's claims fall squarely within the "continuing violation doctrine," under which accrual of a plaintiff's civil rights claim is deemed to be postponed until the final instance of allegedly discriminatory behavior. *See Beasley*, 966 F.Supp. at 1129–30. As the court explained, two different standards exist under which such a continuing violation may be found, namely the "series-of-related-acts" or "continual acts" standard, and the "systematic policy of discrimination" standard. *See id.* at 1129. Beasley's claims were found to satisfy the first of these standards, based on the fact that her scholarship claim was closely entwined with her equivalent treatment claim, because Beasley allegedly would have been eligible to receive the promised scholarship throughout her period of NCAA eligibility had she received prompt medical coverage for her 1991 foot injury, and ASU's repeated denials of medical coverage kept her medical treatment claim alive until December 1995, well within the two-year limitations period. *See id.* at 1129–30.

Importantly, the court also held that Beasley had alleged sufficient facts to establish a continuing violation under the "systematic policy of discrimination" standard. As explained in the June 9, 1997, order, to satisfy this standard " '[a] plaintiff must establish that the unconstitutional or illegal act was

part of "standard operating procedure," a fixed and continued practice.... [I]f the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute [of limitations] does not foreclose an action aimed at [ ] enforcement of the policy during the limitations period.'" *Beasley*, 966 F.Supp. at 1130 (quoting *Perez v. Laredo Junior College*, 706 F.2d 731, 733–34 (5th Cir.1983)). Because Beasley claimed that ASU had violated her statutory rights in an ongoing fashion by adhering to a pervasive policy that disfavored and directed insufficient attention, funds, and resources to women's sports, the court concluded that she had adequately alleged the existence of a "systematic policy of discrimination" that extended into the two-year limitations period. Thus, the court found that Beasley had established a continuing violation under this alternative standard.

As stated, the defendants now ask the court to revisit its conclusion that Beasley's claims are not time-barred based upon application of the continuing violation doctrine. Specifically, the defendants point out that, with the lone exception of her scholarship claim for the 1991–92 academic year, Beasley has abandoned all of her claims of discrimination, including those concerning her allegedly unequal medical treatment by ASU, which are the only claims that extend into the limitations period. Consequently, the defendants assert, this lawsuit is now time-barred because the sole act of discrimination still alive in the suit occurred outside of the limitations period, and Beasley no longer alleges any specific acts of discrimination that occurred within that period.

While the court finds the defendants' argument to be well founded, the effect exerted by Beasley's withdrawal of her unequal medical treatment and accommodations claims on the continuing violation question is not quite as straightforward as the defendants suggest. Accordingly, the court will endeavor to explain with care its conclusion that Beasley's lawsuit no longer satisfies either standard for a continuing violation, and that her suit therefore is time-barred, unless the applicable statute of limitations may be tolled on independent grounds.

■ The court agrees with the defendants' contention that absent Beasley's unequal medical treatment claims her lawsuit does not meet the "series-of-related acts" standard to establish a continuing violation. As the court explained in its previous order, "In the context of continual unlawful acts, such acts must be directed against the individual plaintiff, *and at least one event must fall within the limits period.*" *Beasley*, 966 F.Supp. at 1129 (emphasis added). As the lawsuit presently stands, because Beasley has withdrawn her claim that she was wrongly subjected to unequal treatment of her athletic injury, and her suit is now wholly predicated upon ASU's denial of her scholarship for the 1991–92 academic year, she no longer alleges any specific events constituting acts of discrimination that took place within the two-year limitations period.[4] Of course, if she were presently alleging, in addition to the 1991–92 scholarship claim, that she had been denied a scholarship for an academic year falling within the two-year limitations period, and could point to evidence that would permit a reasonable trier of fact to conclude that this denial stemmed from gender discrimination, Beasley would be deemed to have satisfied the series-of-related acts standard and her lawsuit would not be time-barred. However, simply stated, the 1991–92 scholarship claim, when asserted alone and disentangled from the medical treatment claim that could have drawn it into the limitations period, accrued far more than two years prior to the initiation of this lawsuit and consequently is time-barred.

4. To be sure, Beasley maintains that she is also entitled to pursue her claim for injunctive relief on behalf of others currently subjected to ASU's allegedly unlawful athletic scholarship program. However, although Beasley initially sought class certification by motion dated June 25, 1996, the court denied this motion with leave to renew, by order entered March 27, 1997, and Beasley has not renewed her request to certify a plaintiff class. Moreover, even if Beasley were deemed to represent a plaintiff class, she has failed to proffer any evidence of a *specific* discriminatory act, against her or anyone else, pertaining to the awarding of athletic scholarships within the two-years limitation period. Consequently, she could not satisfy the series-of-related-acts standard for a continuing violation even as a class representative.

■ The complication in the analysis of whether Beasley has alleged a .continuing violation and thus evades the statutory bar despite the abandonment of her medical treatment claim arises when one examines whether she has satisfied the alternative "systematic policy of discrimination" standard for a continuing violation. With respect to this standard, there are two main approaches to determining whether a plaintiff has successfully alleged a continuing violation.[5] The nature of this type of continuing violation is that "the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period." *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir.1982). The first approach used to evaluate whether such a violation exists is illustrated in *Abrams v. Baylor College of Medicine*, 805 F.2d 528 (5th Cir.1986), and can be called an "enforcement" approach. Under this approach, as long as the discriminatory policy is in effect during the limitations period, and there is some enforcement of the policy against a plaintiff, that plaintiff would be able to file a timely charge. *Id.* at 533–34. There need

not be a specific act of discrimination against the plaintiff, but the mere existence of a policy will not suffice to support a timely claim. *Id.* The second approach is illustrated in *Roberts v. North Am. Rockwell Corp.*, 650 F.2d 823 (6th Cir.1981), and can be called an "on-going policy" approach.[6] Under this approach, the mere existence of a discriminatory policy is sufficient, and so long as the policy is in effect, charges under it are timely. *Id.* at 826–28.

■ Thus, under either approach to satisfying the "systematic policy of discrimination" standard, Beasley must show that ASU's denial in 1991 of her athletic scholarship was the direct consequence of its adherence to a systematic policy of gender discrimination in the awarding of such scholarships, and that this policy remained in effect during the limitations period. However, as explained more fully below, Beasley cannot make this requisite showing because she lacks evidentiary support for an argument that a gender-discriminatory athletic scholarship program existed at ASU during any part of the two-year limitations period.

---

**5.** *See* Robert J. Reid, *Confusion in the Sixth Circuit: The Application of the Continuing Violation Doctrine to Employment Discrimination*, 60 U.Cin.L.Rev. 1335, 1342–48 (1992).

Reid's article actually identifies three approaches for evaluating claims of this latter type of continuing violation. The approach that is not discussed here was articulated in *Lorance v. AT&T Technologies*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), and can be called a "date of injury" approach. In *Lorance*, this approach was used in dealing with a facially-neutral seniority system that was adopted for discriminatory reasons. The Court concluded that the date of the institution of the employer's policy served as the date of injury, and a plaintiff must file a claim within 180 days of this date. *Id.* at 909–13, 109 S.Ct. at 2267–69. This approach is not discussed here for four main reasons. First, from the discussion in the Supreme Court's opinion, the application of this approach seemed very much limited to facts like those in *Lorance*—a discriminatory use of a facially-neutral policy. Second, the continued viability of this approach is called into question because Congress specifically abrogated this ruling with its 1991 amendments to Title VII. *See* Civil Rights Act of 1991, Pub.L. No.. 102–166, § 112, 105 Stat. 1071, 1078–79 (1991), as codified, 42 U.S.C.A. § 2000e–5(e)(2). Third, the Eleventh Circuit has indicated that it does not see this

decision as relevant in this context. *See Knight v. Columbus, Ga.*, 19 F.3d 579, 585 n. 4 (11th Cir.1994) ("[W]e have previously described *Lorance* as 'merely an application of the traditional distinction' between a continuing violation and the present consequences of a one-time past act of discrimination.' ") (citations omitted). Finally, even if this approach were still viable, and had widespread application, it would be unavailing for Beasley because she have not alleged that the discriminatory scholarship policy at issue here was adopted during the two-year limitations period.

**6.** The on-going policy approach is much less frequently used than the enforcement approach, and its continued viability is even questionable in the Sixth Circuit. In *Dixon v. Anderson*, 928 F.2d 212 (6th Cir.1991), while citing to *Roberts*, the court held that a plaintiff would have to show some present discriminatory act, not merely the existence of a discriminatory policy, to show a continuing violation. *Id.* at 217–18. This is contrary to the holding of *Roberts*, and, consequently, may overrule or modify *Roberts*. Nonetheless, the court still discusses this approach here because it is the most favorable approach for Beasley, and illustrates the infirmity of her claim because, even under the most favorable approach, she cannot show a continuing violation.

■ At the outset, a few words about Beasley's burden at this stage of the litigation are in order. Because this lawsuit is before the court on a motion for summary judgment, to survive the motion Beasley must produce evidence sufficient to support a jury finding that ASU engaged in a continuing violation—specifically, that a systematic policy of gender discrimination in the awarding of athletic scholarships existed during the limitations period—and that the denial of Beasley's promised 1991–92 scholarship was part of that continuing violation. *See Wingfield v. United Technologies Corp.*, 678 F.Supp. 973, 977 (D.Conn.1988). Beasley's burden, therefore, is now more onerous than it was at the motion to dismiss stage, when the court last addressed the continuing violation question. At that earlier juncture, Beasley's factual allegations were accepted as true and she had only to allege facts suggesting that ASU had engaged in a continuing violation.

Thus, with respect to the "systematic policy of discrimination" theory of continuing violation, the court must determine whether Beasley has adduced sufficient evidence to permit a reasonable factfinder to conclude that a systematic policy of gender discrimination in the awarding of athletic financial assistance existed at ASU at the time Beasley was denied an athletic scholarship for the 1991–92 academic year, and that this policy remained in effect during some portion of the limitations period governing her claim.

Because Beasley initiated this lawsuit by filing her complaint on March 15, 1996, the two-year limitations period commenced on March 15, 1994, and to survive summary judgment Beasley must proffer sufficient evidence to permit a finding that the alleged systematic policy of gender discrimination extended beyond that date. More specifically, the evidence must support a finding that the policy was in effect when Beasley was denied an athletic scholarship for the 1991–92 academic year, and that this policy remained intact until at least March of the 1993–94 academic year.[7]

To determine whether Beasley has satisfied this burden, the court must examine in some detail the requirements imposed by Title IX upon plaintiffs who attempt to establish that they have been discriminated against on the basis of gender in the provision of athletic financial assistance. As the court explained in its previous order, *see Beasley*, 966 F.Supp. at 1122, Title IX's implementing regulations specify that schools must "provide reasonable *opportunities for* [scholarship or grant] awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics." 34 C.F.R. § 106.37(c)(1). According to the United States Department of Education's understanding of this regulation, as set forth in its Policy Interpretation, compliance should be determined by "whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs," Fed.Reg. at 71415, as measured by "dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results." *Id.* If this comparison results in a finding of "substantial" equality, or a disparity that "can be explained by . . . legitimate, nondiscriminatory factors," compliance will be found. *Id.*

■ As further explained in the previous order, for purposes of the athletic scholarship claim, "it is irrelevant what the overall participation rates of men and women in ASU's athletic programs are, relative to their enrollment. What matters is simply whether 'the total amounts of scholarship aid made available to men and women [are] substantially proportionate to their participation rates.' The actual number or dollar value of individual scholarships made available to men and women is not directly compared." *Beasley*, 966 F.Supp. at 1122 (quoting 44 Fed.Reg. at 71415).

---

7. Demonstrating that a gender-discriminatory policy was in effect during the 1992–93 academic year only, and not during the 1993–94 year, would be insufficient to establish a continuing violation during the limitations period, because that period commenced, as stated, in March of 1994.

The court is aware of no published decision addressing the question of whether an educational institution has satisfied the substantial-equality requirement in its provision of athletic scholarships. Fortunately, however, further guidance regarding Beasley's burden for demonstrating gender discrimination in athletic scholarship awards is provided by the 1990 version of the Title IX Investigator's Manual prepared by OCR to assist its investigators in monitoring educational institutions' compliance with Title IX's mandates.[8] *See* Valerie M. Bonnette & Lamar Daniel, Department of Education, Title IX Athletics Investigator's Manual (1990). Regarding athletic scholarships, the Investigator's Manual sets forth the analysis that should be used to determine whether an educational institution offers proportionately equal amounts of scholarship aid to men's and women's athletic programs. *See id.* at 17. In addition to the calculations used to determine whether any disparity exists in the scholarship amounts made available to men and women athletes, which were described in Part I of this memorandum opinion, the Investigator's Manual sets forth two statistical tests, denoted the "z" test and "t" test, designed to determine whether any differences in the proportion of aid or average awards to men and women are statistically significant and therefore signal a violation of Title IX's requirement of substantial equality, absent nondiscriminatory justifications for the disparity. *See id.* at 17, 153–159. If either test results in a finding of statistical significance, OCR considers the institution to be in violation of Title IX, unless a legitimate nondis-

criminatory explanation is provided. *See id.* at 159.

Thus, in contrast to the instructions in the Investigator's Manual regarding the assessment of whether substantial proportionality exists in men's and women's participation opportunities, which state that "There is no set ratio that constitutes 'substantially proportionate' or that, when not met, results in a disparity or a violation," *see* Investigator's Manual at 24, the instructions concerning athletic scholarship awards provide specific guidance, in the form of two statistical tests, for assessing whether substantial proportionality has been achieved and Title IX's mandates have been complied with.

As previously stated, the court finds that it is appropriate to accord deference to the OCR's interpretation of its own regulations, as reflected in the instructions set forth in the Investigator's Manual. Thus, in determining whether Beasley has satisfied her burden of proffering sufficient evidence to permit a finding that ASU failed to award its male and female student-athletes with substantially proportionate athletic scholarship support, the court will rely to a large degree on the statistical tests described in the OCR's Investigator's Manual.

As discussed above, Beasley has provided information regarding the awarding of athletic scholarships to men and women for the 1991–92 through 1996–97 academic years. This information is sufficient to permit application of the "z" test prescribed by the OCR, and Beasley, at the court's behest, has submitted the results of this test for all five years.[9] The "z" test yields a numerical re-

8. In their struggle to determine the standards imposed on educational institutions by Title IX, and to develop appropriate tests to gauge compliance, courts have repeatedly turned to the instructions provided by the OCR in its Investigator's Manual. *See, e.g., Cohen v. Brown University*, 809 F.Supp. 978, 988 (D.R.I.1992) (recognizing that the unpublished Investigator's Manual does "not carry the force of law or establish controlling standards," but concluding that it is, to some extent, an important guide "in unraveling the requirements of the athletic regulation"), *aff'd*, 991 F.2d 888 (1st Cir.1993); *see also Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 828–30 (10th Cir.) (looking to Investigator's Manual for guidance regarding the substantial proportionality test governing the effective accommodation require-

ment), *aff'g Roberts v. Colorado State Univ.*, 814 F.Supp. 1507 (D.Colo.1993), *cert. denied*, 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993). This court agrees with these courts that some measure of deference should be accorded to the Investigator's Manual, which reflects OCR's interpretation of its own regulations.

9. The court has confirmed that Beasley's calculations of the "z" values are correct.

With the possible exception of the 1991–92 academic year, the parties have not submitted the raw data necessary to perform the "t" test, which is more complicated than the "z" test and addresses disparities in the average award provided to male and female athletes. Thus, the

sult, the "z" value, for each academic year. According to the OCR's guidelines, a "z" value of greater than 1.96 indicates that the disparity between men's and women's scholarship award opportunities are significant, and that substantial equality has not been achieved. *See* Investigator's Manual at 154. The results of the application of the "z" test to ASU's athletic program are as follows:

| Academic Year | "z" value |
|---|---|
| 1991–92 | 6.03 |
| 1992–93 | 3.33 |
| 1993–94 | 1.04 |
| 1994–95 | 0.48 |
| 1995–96 | 0.71 |
| 1996–97 | 1.29 |

As is evident from this table, the "z" value exceeded 1.96 during only the 1991–92 and 1992–93 academic years. Consequently, according to OCR's guidelines, ASU was not in compliance during those years with Title IX's mandate that men's and women's athletic programs enjoy access to proportionately equal amounts of scholarship aid, unless there exist legitimate, nondiscriminatory factors that explain the disparity.

■ Therefore, Beasley appears to have satisfied her burden of adducing evidence that would permit a reasonable factfinder to conclude that ASU failed to comply with Title IX as to the provision of athletic scholarships in the 1991–92, the year in which she was denied a scholarship that was allegedly promised to her, and the following academic year, 1992–93. This evidence potentially could enable her to demonstrate that a "systematic policy of discrimination" existed during those years. However, Beasley Cannot demonstrate, by application of the "z" test prescribed by the OCR, that ASU's scholarship program was tainted by a statistically-significant disparity during the subsequent academic years, including the critical 1993–94 academic year, which marks the commencement of the governing two-year limitations period. Consequently, Beasley is unable to demonstrate, as she must to evade the two-year time bar under a continuing violation theory, that any systematic policy of discrimination in the provision of athletic scholarships persisted into the limitations period, at least as gauged by the "z" test.

The question remains whether, despite the fact that the "z" test indicates that ASU brought itself into compliance with Title IX and thus ended its gender-discriminatory program by the beginning of the 1993–94 academic year, Beasley may demonstrate by other means that discrimination in scholarship support extended beyond that time. However, even assuming that there exist alternative avenues of establishing that the provision of scholarship awards is not substantially proportionate, say, for instance, by showing that certain male athletes in positions equivalent to their female counterparts (e.g., male versus female volleyball players) enjoy disproportionately greater scholarship support,[10] the court finds that Beasley has not adduced any evidence indicative of such a disparity in the awarding of scholarships to male and female athletes by ASU during any portion of the limitations period. Consequently, Beasley has not shown that a systematic policy of discrimination persisted into the two-year period by means other than the "z" test.

Moreover, the court notes that the OCR specifically concluded, after its investigation of Beasley's complaint of discrimination, that for the academic year 1993–94 the athletic financial assistance made available to men and women was substantially proportionate to their participation rates in ASU's intercollegiate program.[11] Presumably, this finding

court relies only upon the results of the "z" test in determining whether Beasley has proffered sufficient evidence to survive the defendants' motion for summary judgment. As noted above, according to the OCR a finding of statistical significance under the "z" test suffices to establish that an institution has not achieved substantial equality in scholarship awards.

**10.** *See Beasley,* 966 F.Supp. at 1122–23 ("Title IX can be violated *either* by substantial gender disparities in an institution's athletic programs as a whole, or by disparities in *individual segments* of the program with respect to benefits, treatments, services or opportunities which are substantial enough in and of themselves to deny equality of athletic opportunity") (citing Policy Interpretation, 44 Fed.Reg. at 74417–18) (emphasis in original).

**11.** OCR final letter to complainant Audra Beasley, dated June 29, 1995, defendants' exhibit 14, at 1.

was based largely on the "z" value calculated for that year, but it also may have been grounded on other information gleaned during the investigation. In any event, the OCR's approval of ASU's scholarship program for the 1993–94 academic year lends further support to the court's conclusion that any policy of gender discrimination in athletic scholarship awards did not persist into that year, which, as explained above, is crucial to Beasley's efforts to establish a continuing violation based upon the systematic policy of discrimination theory.

█ Additionally, the court finds that Beasley cannot overcome the time bar on a systematic-policy-of-discrimination theory based upon her claims for prospective relief on behalf of herself and others. As explained above, no class has been certified in this case. Furthermore, though Beasley's NCAA eligibility did not expire until after she filed her lawsuit, and she therefore potentially could have been subject to a discriminatory scholarship policy within the two-year limitations period if one actually existed, the "z" test results described above show that Beasley failed to establish that ASU was out of compliance, during any portion of the limitations period, with Title IX's substantial-equality requirement regarding the provision of athletic scholarships.[12] Consequently, even if Beasley could show that she is eligible for prospective relief based upon the existence of a current or imminent discriminatory athletic scholarship policy at ASU, she could not establish the requisite continuum between the policy in place during the 1991–92 academic year in which she was denied a scholarship and the present or future policy. Simply stated, the evidence shows that any link between the past discriminatory policy and any putative present or future policy was broken when ASU brought itself into compliance with Title IX during the 1993–94 academic year, and maintained its compliance during the subsequent years.

For the foregoing reasons, the court finds that Beasley's late-filed denial-of-scholarship claim for the 1991–92 academic year, the sole remaining claim for which she seeks damages under Title IX and § 1983, is not preserved under any continuing violation theory because she has failed to proffer sufficient evidence to permit a reasonable factfinder to conclude that ASU awarded athletic scholarships in a gender-discriminatory fashion during any portion of the applicable two-year limitations period. While the continuing violation doctrine was found to be applicable when Beasley's lawsuit also included allegations of unequal treatment of her athletic injury, now that she has abandoned these claims there are no alleged violations within the limitations period to which the otherwise time-barred denial-of-scholarship claim could be linked.

### ii.

Having found that Beasley may no longer rely upon the continuing violation doctrine to evade the two-year statute-of-limitations bar applicable to her claims, the court must turn next to the question of whether there exist any independent reasons to suspend running of the statute and thus preserve her denial-of-scholarship claim.

In its previous order, the court recognized the possibility that Beasley's claims may be actionable even if they had not accrued during the limitations period, because her filing of an administrative complaint with the OCR may have tolled the running of the statute of limitations during the pendency of the administrative procedures. See Beasley, 966 F.Supp. at 1131. Now, because the continuing violation doctrine has been deemed inapplicable to Beasley's sole remaining claim for damages, the court must examine more closely the question of whether the pursuit of federal administrative proceedings in advance of bringing suit under § 1983 and Title IX tolls the running the statute.

As an important threshold matter, the court must first ascertain whether, assuming that it indeed finds that the statute was tolled during the pendency of Beasley's administrative claims, the tolling period was long enough to have preserved Beasley's claims until she filed this lawsuit on March

---

12. As shown above, the "z" values for the 1993–94, 1994–95, 1995–96, and 1996–97 academic years were 1.04, 0.48, 0.71, and 1.29, respectively.

15, 1996. Two central questions underlie this inquiry. First, the court must determine with some degree of precision when Beasley's 1991–92 athletic scholarship claim actually accrued, and, second, the court must ascertain when the proceedings before the OCR were initiated and when they ended, to determine the precise tolling period associated with her pursuit of administrative proceedings. Of course, if Beasley's claim accrued too early for the tolling period to have preserved her claim, there is no need for the court to address the question of whether tolling is appropriate under the circumstances presented here, because even if tolling were applied, her claim would have come too late.

Regarding the question of when Beasley's 1991–92 denial-of-scholarship claim accrued, the court first notes that the defendants, in their previous motion to dismiss, contended that Beasley's cause of action to bring suit for the denial of her scholarship accrued at the time she was told that he would not receive scholarship support, in the fall of 1991. *See Beasley,* 966 F.Supp. at 1128. Now, however, they have retreated from that position, and contend instead that Beasley was aware of facts putting her on notice of the scholarship claim by at least the fall of 1992, based in part upon Beasley's deposition testimony that she learned at that time about an alleged disparity in scholarship support for male and female student-athletes at ASU.

■■■■■ As the court noted in its June 9, 1997, order, although state law informs as to the applicable limitations period for Title IX and § 1983 claims, federal law governs the determination of when a cause of action under these statutes accrues. *See Beasley,* 966 F.Supp. at 1128. The applicable federal law establishes that accrual occurs " 'the moment the plaintiff knows or has reason to know of the injury that is the basis of [the] complaint.' " *Id.* (quoting *Helton v. Clements,* 832 F.2d 332, 335 (5th Cir.1987)). Moreover, where the plaintiff alleges unlawful discrimination under federal law, the Eleventh Circuit Court of Appeals has applied the foregoing standard to hold that the cause of action does not accrue until the supporting facts—that is, evidence of discriminatory conduct—

are apparent, or would have been apparent to a reasonably prudent person. *See Calhoun v. Alabama Alcoholic Beverage Control Bd.,* 705 F.2d 422, 425 (11th Cir.1983); *see also, Rozar v. Mullis,* 85 F.3d 556, 562 (11th Cir. 1996).

■■■■ Thus, the court agrees with the defendants that Beasley's claim regarding her scholarship for the 1991–92 academic year accrued in the fall of 1992, because it was only at that time, in discussions with male athletes at ASU, the women's volleyball coach, and ASU's athletic director, that she became cognizant of evidence of gender discrimination in ASU's athletic scholarship program. The date upon which she obtained this knowledge need not be ascertained with precision, because, as will be seen, the approximate date is sufficient to determine whether tolling during the pendency of Beasley's administrative proceedings would preserve her scholarship claim.

■■■■ Next, the court must determine the commencement and termination dates of the administrative procedures before the OCR. The undisputed record establishes that Beasley filed her complaint with the OCR on September 13, 1993, and that the OCR informed her by letter dated June 29, 1995, that it had completed its investigation regarding her complaint. Therefore, the period for which tolling would occur, if tolling were deemed appropriate, is from September 13, 1993 to June 29, 1995.

Based upon the foregoing facts, it is clear that if tolling during the pendency of the OCR proceedings is deemed appropriate, Beasley's claims have been preserved, and her March 15, 1996, filing of this lawsuit is timely. As stated, her scholarship claim accrued during the fall of 1992, and she filed her complaint with the OCR on September 13, 1993. Therefore, approximately one year had elapsed between accrual and initiation of the administrative procedures. Those procedures ended on June 29, 1995, and Beasley filed the immediate lawsuit on March 15, 1996. Thus, assuming that the running of the statute of limitations was tolled during the pendency of the OCR proceedings, another eight and one-half months elapsed prior to

the filing of her lawsuit. In total, then, the statute of limitations had run for approximately 20 or 21 months (approximately one year plus eight and one-half months) before Beasley filed her lawsuit, and it would not be time-barred.

Because the foregoing analysis demonstrates that Beasley's claim is indeed timely if tolling is applied to the period in which she pursued her administrative remedies with the OCR, the court must determine whether such tolling is proper. In its previous order, the court remarked upon the possibility, without actually deciding, that the running of the statute should be tolled during the pendency of the administrative proceedings, under the applicable Alabama law. *See Beasley*, 966 F.Supp. at 1131. In making this observation, the court pointed to a decision of the Alabama Supreme Court, *Jefferson County v. Reach*, 368 So.2d 250, 252 (Ala. 1978), and two Eleventh Circuit decisions, *Rubin v. O'Koren*, 644 F.2d 1023 (5th Cir. Unit B 1981) and *Calhoun v. Federal Nat'l Mortgage Assoc.*, 823 F.2d 451, 456 (11th Cir.1987), which indicated that pursuit of an elective grievance procedure could toll the running of a statute of limitations.

In their motion for summary judgment, the defendants contend that these authorities are inapposite here, because they concerned § 1983 claims for violations of due process, in which the alleged inadequacy of the very state administrative remedies that the plaintiff pursued before filing his or her lawsuit is an essential element of the § 1983 claim. By contrast, the defendants argue, where the federal statutory claim does not involve questions of due process, as is true of Beasley's § 1983 and Title IX claims, it is well-settled under the governing case law that the running of the statute is not tolled pending pursuit of administrative remedies *unless* exhaustion of such remedies is a prerequisite to filing suit. In other words, according to the defendants, where administrative remedies are merely elective the limitations period runs continuously from the accrual date, irrespective of whether or not the plaintiff opts to avail herself of administrative grievance proceedings. Because exhaustion of administrative remedies is mandated by neither

§ 1983 nor Title IX, the defendants' argument continues, it follows that the statute of limitations governing Beasley's claims was not subject to any tolling while she pursued her complaint before the OCR.

Regarding the defendants' contention that the decisions cited by the court in its previous order concerning tolling are inapposite here, the court agrees that both *Reach* and *Rubin* involved claims for violations of due process, while Beasley alleges no such due-process claims. The court also agrees with the defendants' observation that a third decision cited by the court, *Calhoun*, held *Rubin* to be inapposite where the plaintiff alleged a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621 through 634, rather than a due-process claim under § 1983. However, the defendants' assertion that these decisions are inapplicable to the present case for the foregoing reasons betrays a misunderstanding of *Rubin* and *Calhoun*, as explained below.

In *Rubin*, an instructor challenged her termination by the University of Alabama in federal district court under § 1983. She had brought her lawsuit more than a year and a half after her last day of employment with the university, but argued that her claims were not time-barred because the applicable one-year limitation period should have been tolled for the duration of administrative grievance proceedings before a university committee that she had pursued in advance of bringing suit. *Rubin*, 644 F.2d at 1025. The court, in agreeing with the plaintiff, reached two distinct holdings, only one of which is directly relevant to the instant dispute. The defendants' confusion regarding *Rubin*'s reach stems from the fact that they have apparently conflated the two holdings.

The *Rubin* court's first holding, which is not pertinent to Beasley's lawsuit, concerned a controversy over whether the plaintiff's claims accrued when she was initially provided with notice that she would be terminated by the university, or on the last date of her employment, slightly more than one year later. The court, distinguishing the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), emphasized that the

plaintiff had alleged that the university had inflicted numerous injuries upon her during the time period between her termination notification and the final day of her employment, and therefore that her cause of action had not fully accrued until the latter date. *Rubin,* 644 F.2d at 1025. The court contrasted this scenario with that presented in *Ricks,* in which the Supreme Court had held on different facts that the limitations period began to run upon initial notification rather than the last day of employment, noting that the plaintiff in *Ricks* had not alleged any injurious acts occurring after the date on which he was notified that his employment was going to be terminated. *See id.*

Next, having held that the plaintiff's claim accrued on the last day of her employment, the *Rubin* court turned to the question that is most pertinent to the instant dispute, namely whether the plaintiff's claims were time-barred because she had not filed her federal lawsuit until over a year and a half after her final date of employment, or whether the one-year limitations period should be tolled for the duration of the administrative proceedings that she initiated shortly after her last day of employment. It was in relation to this question that, pursuant to the requirement that federal courts look to state tolling law in determining whether the running of a statute of limitations should be suspended, *see Board of Regents v. Tomanio,* 446 U.S. 478, 483, 100 S.Ct. 1790, 1794, 64 L.Ed.2d 440 (1980) (noting that under Supreme Court precedent federal courts are obligated not only to apply analogous state statutes of limitations where a federal statute supplies no limitations period, but also to apply state tolling rules), the *Rubin* court cited *Reach* for the proposition that under Alabama law the pursuit of a grievance procedure tolls the applicable statute of limitations, and further noted that such tolling is consistent with the federal policies underly-

ing § 1983, as required by the Supreme Court in *Tomanio.* *See Rubin,* 644 F.2d at 1025–26. In accordance with the holding in *Reach* and its conclusion that the Alabama tolling procedure is fully consistent with § 1983, the *Rubin* court concluded that the plaintiff's pursuit of administrative proceedings tolled the one-year limitations period and that her action therefore was timely. *Rubin,* 644 F.2d at 1026.

Despite the defendants' contention to the contrary, this second holding in *Rubin* cannot reasonably be read as limited to claims for violation of due process; instead, only the first holding, pertaining to the accrual date issue addressed by the Supreme Court in *Ricks,* can be so construed.[13] Moreover, *Calhoun,* which the defendants rely upon in support of their argument that the holding in *Rubin* pertains only to due-process claims, does not undermine, but rather reinforces, this court's conclusion. In *Calhoun,* the plaintiff cited *Rubin* to urge that the limitations period governing his ADEA claim had never begun to run because he had not been provided with a hearing on his discharge from employment. 823 F.2d at 456. Clearly, this argument concerned the first, accrual-date issue in *Rubin,* and not the tolling issue that is relevant to the instant dispute over Beasley's claims. In fact, no tolling issue whatsoever arose in *Calhoun* with respect to the ADEA claim, and the court plainly was focused on the relationship between the case before it and the scenario presented in *Ricks.* *See Calhoun,* 823 F.2d at 455–56. Thus, *Calhoun* casts no doubt upon this court's conclusion that the holding regarding Alabama's tolling law in *Rubin* may be extended to non-due-process claims like those alleged here by Beasley.

 Having shown that the defendants' misreading of *Rubin* and *Calhoun* undermines their contention that the former deci-

---

13. The court notes that Judge Hill, in his concurrence in *Rubin,* took issue with the majority's analysis. Specifically, Judge Hill would have found that the plaintiff's injury did not accrue until the end of her administrative grievance proceedings before the university committee, because the due process violations she alleged continued until that date. *Rubin,* 644 F.2d at 1026 (Hill, J., concurring). Consequently, he would

have found that the plaintiff's complaint was timely without regard to the Alabama law of tolling. *Id.* Thus, if Judge Hill's analysis had commanded a majority, the defendants' understanding of *Rubin* would have been more accurate, as the plaintiff's complaint would have been deemed timely only because she had alleged due process violations under § 1983.

sion's holding regarding tolling during the pendency of administrative proceedings does not apply here, the court must grapple next with the question of whether *Rubin* accurately reflects the law of this circuit despite the existence of other decisions, both pre- and post-dating *Rubin,* in which the Eleventh Circuit has held, according to the defendants, that tolling is impermissible where exhaustion of administrative proceedings is not a prerequisite for filing suit in federal court.[14] While none of the decisions cited by the defendants addresses the specific question presented here, namely whether pursuit of a complaint before the OCR should toll the running of the statute governing the filing of an action under Title IX or § 1983, the court must nonetheless examine these decisions with care to assess whether they preclude Beasley from invoking the *Rubin/Reach* tolling rule to preserve her claims.

The defendants rely principally upon three decisions, *Smith v. McClammy,* 740 F.2d 925 (11th Cir.1984), *Black v. Broward Employment & Training Admin.,* 846 F.2d 1311 (11th Cir.1988), and *Bryant v. Potts,* 528 F.2d 621 (5th Cir.1976), in contending that the law of this circuit precludes tolling where exhaustion of administrative remedies is not a prerequisite to filing suit. In *Smith,* the plaintiff, a college instructor in Alabama, argued that the statute of limitations governing her § 1983 claim stemming from her termination of employment should be tolled during the pendency of her state administrative proceedings before the Alabama Education Association. *See* 740 F.2d at 927. The Eleventh Circuit, noting that exhaustion of administrative remedies is not a prerequisite to filing a § 1983 action in federal court, rejected this argument, and held that the statute began to run on the date of accrual of the plaintiff's cause of action. *See id.* The court made no reference to its previous decision in *Rubin,* nor did it discuss whether tolling pending the pursuit of elective administrative remedies is permissible under Alabama law.

14. The court agrees with the defendants that there is no requirement that individual complainants exhaust administrative remedies prior to filing suit under Title IX, *see Cannon v. University*

In *Black,* a former employee of an agency organized to administer grants under the Comprehensive Employment and Training Act of 1973 ("CETA") brought suit against the agency under Title VII and § 1983 for sex discrimination pertaining to her termination. The plaintiff argued that running of the applicable statute of limitations was tolled while she pursued her federal administrative remedies under CETA. *See Black,* 846 F.2d at 1312. On appeal, which addressed only the plaintiff's § 1983 claim, the Eleventh Circuit found that exhaustion of federal administrative remedies under CETA was not required prior to bringing suit under § 1983. *See id.* at 1312–1314. Because exhaustion was not a prerequisite, the court held that the limitations period was not tolled while the plaintiff pursued her elective administrative proceedings under CETA. *See id.* at 1314. As in *Smith,* the Eleventh Circuit neither cited *Rubin* nor examined whether tolling was appropriate under state law.

Similarly, in *Bryant,* a decision that predated *Rubin,* the former Fifth Circuit held that the plaintiff's pursuit of administrative remedies would not interrupt the limitations period for filing a § 1983 action, for which exhaustion of such remedies is not a prerequisite. *See* 528 F.2d at 622. Once again, the court did not examine state tolling law to determine whether tolling was appropriate under such circumstances.

Thus, this court is confronted with an apparent conflict in Eleventh Circuit authority regarding the propriety of tolling where the plaintiff has opted to pursue elective administrative remedies prior to filing suit in federal court. *Rubin,* as explained above, relied upon Alabama tolling law to find that tolling is appropriate under such circumstances, while *Smith, Black,* and *Bryant* all reach what appears to be a contrary conclusion. In all four cases, tolling was sought by a plaintiff who chose to pursue optional administrative remedies before filing a § 1983 claim in federal court. In *Rubin*

*of Chicago,* 441 U.S. 677, 706 n. 41, 99 S.Ct. 1946, 1962 n. 41, 60 L.Ed.2d 560 (1979), or under § 1983, *see Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

and *Smith*, the administrative proceedings were before non-federal entities (a university grievance committee in *Rubin*, and the Alabama Education Association in *Smith*), while in *Black* the plaintiff sought relief from a federal agency in advance of bringing suit.[15] Despite this slight difference in the factual settings of the cases, the court perceives no basis upon which *Rubin* may be reasonably distinguished from the other decisions. Instead, it appears that *Rubin* constitutes a departure from the Eleventh Circuit's otherwise consistent application of the rule, first articulated by the former Fifth Circuit in *Bryant*, that tolling does not apply where the administrative proceedings are merely elective, and exhaustion is not a prerequisite to bringing federal suit.

Although troubled by the unexplained inconsistency of the foregoing authorities, and the fact that the Eleventh Circuit referred to state tolling law only in *Rubin*,[16] this court concludes that it is bound to follow the rule articulated in *Bryant* and subsequently applied in *Smith* and *Black*, rather than the inconsistent decision in *Rubin*. As the Eleventh Circuit has recently reiterated, "Where there are inconsistent panel decisions, 'the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th

Cir.1997) (quoting *United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir.1994)), *cert. denied*, —— U.S. ——, 118 S .Ct. 685, 139 L.Ed.2d 632 (1998).[17]

Another reason that the *Rubin* court's holding stands in isolation in the Eleventh Circuit may be that the *Rubin* court's reliance on *Reach* is misplaced. As stated, pursuant to the requirement that federal courts look to state tolling law in determining whether the running of a state's statute of limitations should be suspended, *see Tomanio*, 446 U.S. at 483, 100 S.Ct. at 1794, the *Rubin* court cited *Reach* for the proposition that under Alabama law the pursuit of a grievance procedure tolls the applicable statute of limitations. However, in *Reach*, the Alabama Supreme Court appears to have been interpreting federal, not state, law, in concluding that tolling was warranted under § 1983. At issue was a due-process claim, and the principal cases relied upon by the *Reach* court were cases, primarily federal, addressing federal tolling issues, *see, e.g., Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 258 (5th Cir.1974); *Coppotelli v. Howlett*, 76 F.R.D. 20 (E.D.Ill.1977); *Hunter v. United States*, 417 F.Supp. 272 (N.D.Cal. 1976). Because the *Reach* court was essentially attempting to articulate a broad federal, and not a state, tolling principle, *Tomanio*

15. *Bryant* provides no information as to the nature of the administrative remedies that the plaintiff sought prior to filing his lawsuit.

16. This omission in *Smith, Black,* and *Bryant* may be inconsistent with the requirement that federal courts look to state tolling law in determining whether the running of a statute of limitations should be suspended. *See Tomanio,* 446 U.S. at 483, 100 S.Ct. at 1794. Perhaps the absence of any reference to state tolling law in these decisions reflects the court's unstated understanding that any rule calling for tolling while elective administrative proceedings are pursued would be inconsistent with the federal policy underlying § 1983, which counsels against application of the state rule. *See id.* at 485–86, 100 S.Ct. at 1795–96. Such an understanding, however, would be contrary to the *Rubin* court's express finding that such tolling is consistent with § 1983's underlying policy.

17. The court recognizes that the Eleventh Circuit has stated that "The most favorable means of resolving ostensibly inconsistent panel decisions is to interpret them consistently by identifying the common thread tying them together." *United States v. Miller,* 78 F.3d 507, 510 (11th Cir. 1996). Alternatively, a court may avoid dealing with an apparent intracircuit conflict altogether by finding that under the specific facts of the dispute resolution of the conflict is unnecessary to dispose of the case, or the court may explain the apparent conflict by recognizing that "a subsequent panel is not obligated to follow a prior panel's decision where an intervening Supreme Court decision establishes that the prior panel decision is wrong." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). Unfortunately, this court sees no means by which it may avail itself of any of these options to resolve the conflict it perceives between the decision in Rubin and those in *Smith, Black,* and *Bryant,* and therefore it will treat *Rubin* as an anomaly and follow the law as set forth in the latter three decisions. *Cf. Combs,* 106 F.3d at 1531–32 (disregarding an intervening panel decision that is inconsistent with prior and subsequent decisions because it constituted an "anomaly").

does not compel federal courts to follow this principle.

As previously stated, none of the foregoing decisions addressed the propriety of tolling in the specific circumstances present here, namely where the plaintiff pursued administrative proceedings before the OCR prior to filing a Title IX or § 1983 action in federal court. Nonetheless, in view of the fact that exhaustion of administrative remedies before the OCR is not a prerequisite to filing suit under either Title IX or § 1983, the court sees no barrier to applying the foregoing authorities to the instant dispute. This is especially true with regard to Beasley's claims brought pursuant to § 1983, which is the same federal statute that was at issue in *Smith, Black,* and *Bryant.* Regarding Beasley's Title IX claims, the court recognizes that by first filing a complaint with the OCR regarding ASU's alleged violations of Title IX, Beasley sought relief on the very claims that she eventually raised in her Title IX suit before this court, and that as a result the instant case stands in contrast to all of the cases discussed above, in which the administrative proceedings pursued prior to the federal lawsuit did not specifically involve claims brought under § 1983. However, there is no indication in any of the previously-discussed decisions that the relationship between the specific nature of the administrative claims and those raised in the subsequent lawsuit had any bearing on whether tolling is appropriate.[18] Instead, the dispositive question appears to have been whether or not exhaustion of the administrative remedies was mandated by the federal statute upon which the lawsuit was grounded; where exhaustion is not required, the decisions hold, tolling is inappropriate.

Accordingly, because the administrative remedies that Beasley pursued before the OCR were merely elective and she could have filed suit in this court even while they were pending, the court finds that it may not toll the running of the two-year statute of limitations for the duration of the OCR proceedings.

In summary, the court finds that Beasley's denial-of-scholarship claim for the academic year 1991–92, which accrued in the fall of 1992, is time-barred because it was filed more than two years after it accrued, and Beasley has failed to preserve her claim under a continuing violation theory or by means of a tolling doctrine.

B. Beasley's Claim for Prospective Relief

The final issue raised by the defendants' renewed motion for summary judgment concerns Beasley's sole remaining claim, for prospective injunctive relief on behalf of herself and other female athletes at ASU. As the court explained in its previous order, Beasley could have benefitted from injunctive relief when she brought her lawsuit because she still had NCAA eligibility at the time, and many of the class members she sought to represent would still benefit from such relief even now. *See Beasley,* 966 F.Supp. at 1127. However, because Beasley has not sought to certify a class in this lawsuit, the current posture of the case is significantly different from what it was when the court entered its previous order, and this issue must be examined anew.

As a threshold matter, the court emphasizes that Beasley must have standing as to each and every claim she asserts in her complaint. *See Tucker v. Phyfer,* 819 F.2d 1030, 1033 (11th Cir.1987). Therefore, she must have independent standing to pursue

---

**18.** The court is aware of several decisions, including *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 466, 95 S.Ct. 1716, 1723, 44 L.Ed.2d 295 (1975), which establish that the pendency of administrative proceedings for claims brought pursuant to one federal statute does not toll the statute of limitations for bringing a lawsuit under a second federal statute where the two different statutes provide for remedies that are "truly independent." *See also, Stafford v. Muscogee County Bd. of Educ.,* 688 F.2d 1383, 1388–89 (11th Cir.1982); *Jefferson v. H.K. Porter Co.,* 648 F.2d 337, 339–40 (5th Cir. Unit B 1981). As

this court reads them, however, these decisions do not stand for the converse proposition that tolling is appropriate where the administrative proceedings and subsequent lawsuit arise under the same federal statute, so that identical or substantially similar remedies are available in both venues. The only Eleventh Circuit authority of which the court is aware that even arguably supports such a proposition is *Rubin,* which, as explained above, the court has found to be an anomalous decision that departs from the mainstream of Eleventh Circuit decisions on this issue.

her claim for injunctive relief, and cannot rely upon the fact that she has standing to bring her denial-of-scholarship claim for damages to provide her with standing to assert her claim for prospective relief. *See id.* at 1034. Moreover, "Article III [of the United States Constitution] requires that a plaintiff's claim be live not just when he first brings suit, but throughout the litigation." *Id.* Therefore, Beasley must establish that she had standing to assert her claim for prospective injunctive relief when she first filed suit, and that the controversy concerning this claim has survived until now.

■ While Beasley had standing to pursue injunctive relief when she first filed suit, as well as when she first moved to certify a plaintiff class in June 1996, because she still had several months of eligibility to participate in NCAA athletics at that time, her eligibility has now long expired. Consequently, she can no longer benefit from an order requiring ASU to comply with the mandates of Title IX, and her claim for injunctive relief is now moot. *See Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir.1993) (student-athletes' claims for injunctive relief, absent class certification, rendered moot by their graduation); *Alexander v. Yale*, 631 F.2d 178, 183–84 (2d Cir.1980).

■ However, as the court noted in its previous order, where, as here, a plaintiff enjoys only inherently transient standing, she may preserve her claims for prospective relief by obtaining class certification, because under such circumstances "the termination of a class representative's claim does not moot the claims of unnamed members of the class." *Gerstein v. Pugh*, 420 U.S. 103, 110–11 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991); *Cook*, 992 F.2d at 19–20 (noting the possibility that a student's claim may not be rendered moot by graduation if he or she sued in a representational capacity). Beasley has not availed herself of this opportunity to preserve her claims for injunctive relief, though, because she never renewed her motion to certify a plaintiff class after the court first denied it

with leave to renew in March 1997, and no class has since been certified in this action.

Consequently, Beasley has not staved off the mootness of her claim for injunctive relief, and she cannot now assert this claim on behalf of herself or other female student-athletes at ASU. The defendants' motion for summary judgment is therefore due to be granted as to Beasley's sole remaining claim for prospective injunctive relief.

## IV. CONCLUSION

Because the court finds that Beasley's claim stemming from the denial of her athletic scholarship for the 1991–92 academic year is time-barred, and that she lacks standing to pursue her remaining claim for injunctive relied on behalf of herself and other female student-athletes at ASU, the court will grant the defendants' renewed motion for summary judgment.

An appropriate judgment will be entered in favor of the defendants.