**Delois T. LANE and Ida Mae Farris, Plaintiffs,**

v.

**OGDEN ENTERTAINMENT, INC., Defendant.**

**Civil Action No. 97–A–842–N.**

United States District Court,
M.D. Alabama,
Northern Division.

July 24, 1998.

George A. Harper, Tangla L. Fudge, Jackson, Lewis, Schnitzler & Krupman, Atlanta, GA, Joseph Terrace Carpenter, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

This case is before the court for summary judgment consideration. Defendant originally filed a motion for summary judgment on May 8, 1998. Due to modifications of that motion, and extensions of time received by both sides, summary judgment did not come under submission until July 1, 1998, the day of the pretrial in this case. Further, a related motion—a motion to strike an affidavit submitted by Plaintiffs—did not come under submission until July 7. Matters are now fully before the court, and have been duly considered.

As discussed below, the court holds that the Defendant's motion for summary judgment is due to be GRANTED IN PART and DENIED IN PART. Defendant's motion to strike the Affidavit of Annice Lee is due to be DENIED.

## I. SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548.

Susan Kennedy, Barry D. Woodham, Haskell, Slaughter, Young, Johnston & Gallion, Montgomery, AL, Charles Michael Quinn, Rocco Calamusa, Jr., Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Plaintiffs.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a

genuine issue material to the non-movant's case exists. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates*, 887 F.2d 1493 (11th Cir.1989).

## II. FACTS

In deciding a motion for summary judgment, the evidence presented by the nonmovant, here the Plaintiffs, must be believed and all justifiable inferences must be drawn in their favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The facts, as viewed in that light, are as follows.

### The Crux of the Complaint.

Delois Lane and Ida Mae Farris are the Plaintiffs in this suit. Both are black females and both are long-time employees of Ogden Entertainment in Montgomery, Alabama. Ogden is a contractor with the City of Montgomery. It caters banquets and such that are hosted by the City, or are hosted at City facilities. It has been operating the banquet facilities at the Montgomery Civic Center since about 1976 or 1977.

Plaintiffs bring their claims pursuant to Title VII and 42 U.S.C. § 1981. Plaintiffs primarily claim that they were discriminated against because they were not promoted within their company. Ms. Lane adds to that, that she was effectively demoted through the loss of duties when a white male was hired over her. In addition, Plaintiffs also appear to claim at times that they were discriminated against when the employer stopped guaranteeing them 40 hours of pay, for less than 40 hours of work. Their complaint originally contained a number of additional claims, but all of those have been dropped.

Ms. Farris' particular promotion claim is somewhat peculiar. She bases it not on having actually applied for a position which was open. Rather, she says that she would have been promoted to the position of head cook, if Ms. Lane had not been discriminated against. In effect, she claims that if Ms. Lane had been promoted, she would have been promoted as a consequence. Farris would have stepped into the position formerly held by Ms. Lane. Most all of the facts, therefore, concern the position that Lane was seeking.

### The Position of Chef.

There is a some confusion in this case over exactly what position Lane was seeking to fill. For the purpose of convenience, this court will call it the position of "chef." Ogden apparently considered some employees who filled the position to be "chef trainees," and not "chefs," depending on the status of their license Whichever the title, however, the job position was one and the same. *See Scheiben Depo. at 155; id. at 28–29 (referring to single position of "location chef.").* There was only one position, and one person in this position at a time.

Ogden began operating in Montgomery around 1976–77, and for the first 13 years had no chef at their location. Mr. Scheiben—the general manager of Ogden's location in Montgomery—testified that he performed the functions of chef from around 1977 until 1990, along with his duties as manager. *Scheiben Depo. at 47.* He was never listed on any documents as chef, however. *Scheiben Depo. at 66.*

### Ms. Lane's old Position.

Ms. Lane claims that she sought promotion to chef from her present position as head cook or kitchen supervisor. Again, there is quite a bit of confusion over exactly what her position was termed. Scheiben testified that there was not presently a position of kitchen supervisor. *Id. at 68.* He also testified, however, that when Ogden was opened this position was "one in the same" with head cook, the position held by Ms. Lane *Id. at 68–69.* For convenience again, the court will refer to the position as "head cook."

There is evidence in this case that Lane's duties alternated at times as head cook. Scheiben testified at one point that Lane had never had any duties in addition to those that she presently has; rather her job had always

been to "read the menus and cook the meals." *Id. at 72.* Evidence has been presented, however, that Lane's duties have been diminished as males were brought over her in the position of chef. Scheiben even said that she also had duties including "coordinating and supervising employees" at times. *Scheiben Depo. at 77.* He also said that he consulted with her regarding ordering in the early years, and that she took inventories. *Id. at 79–80.*

Lane testified that for the first 13 years that she worked for Ogden (until a chef was hired), it was her responsibility to "hire employees, take care of the incoming groceries, do the scheduling, d[o] the basic cooking, see that it gets out on time," and supervise between 10 and 20 employees. *Lane Depo. 8:13—9:5.* She did not actually order the groceries herself, nor was she technically a manager. Her boss, Fred Scheiben, actually ordered the groceries, and managed the kitchen and office. *Id. at 18:15—19:19.*

In 1990, Lane lost all of her supervisory duties, however, when Scheiben hired a chef to fill a new position. *Id. at 9:20—10:8.* Ms. Lane feels that the "good times" stopped then. *Id. at 21:5–12.* 1990 was "when Mr. Scheiben hired a white male and brought him in the kitchen and took my position, demoted me and took my position and give it to the white male." *Id.*

The white male that Ms. Lane is referring to is Rob Cawley. Cawley, in the words of Ms. Lane, "took the job as supervisor ... did the ordering, ... did the checking in of the groceries, and ... helped Mr. Scheiben in the office," with paperwork. *Lane Depo. 21:20—22:5.* (Ms. Lane had never before helped with the paperwork. *Id. at 22:9–10.*). The only duties of Lane which Mr. Cawley took were the checking in of the groceries, and making recommendations to Mr. Scheiben as to which applicants should be hired. *Id. at 23–24.*

### Ogden's Hiring Policies.

In order to determine whether Ogden discriminated against Ms. Lane in not promoting her to chef, it is important to look at what hiring policies Ogden had. It is important to know why the others were hired, and not Lane. The phrase "Ogden's hiring policies" is somewhat of a misnomer, however.

It wrongly assumes that Ogden had anything which might properly be termed a policy.

Lane claims that she never even knew that the Defendants were looking to hire a chef in 1990. The first she learned of it was the day that Cawley showed up for work. *Lane Depo. 25:21—26:1.* She complained to Mr. Scheiben that Cawley had taken her position. Scheiben told her that it was "Ogden's doing," that "Ogden wanted a chef." *Lane Depo. 27.* He states that the company was growing, its business was expanding, and that he needed someone to take some of the duties that he had formerly performed. The City of Montgomery's building managers requested that Ogden hire a chef, although the City never put this to paper, and never imposed any requirements on the chef. *Scheiben Depo. at 103.*

Whether Lane was not offered the position is a fact in dispute. Scheiben, in fact, claims that he offered the job to Lane on numerous occasions, even before Cawley was hired. *Id. at 110:1–3.* Scheiben testified that he "repeatedly asked Ms. Lane if she would like to have or learn or adopt or attend a school to acquire the position as the location chef," but Lane told him that "she did not want the responsibilities and that we could work her long hours and wouldn't pay overtime." *Scheiben Depo. at 104.* He thought that he had asked her this four or five times over the years. *Id. at 105.* He offered her the position, even though he believed she was not qualified, because he "would have been willing to work with her and help her develop the additional skills required to be a chef." *Id. at 110.* He would have hired her if she accepted the position. *Id. at 112.*

Not only was the process of announcement somewhat less than ordered according to the Plaintiffs, however. The requirements and process of application were also somewhat disordered. Scheiben readily admits that no requirements for the job were ever written down. *Id. at 174:10–13.* Rather, they were based on needs that he thought were "understood in the industry." *Scheiben Depo. at 150:4–16.* Further, the applicants were evaluated solely on Scheiben's "experience as an executive in the industry." *Id.* He decided who to interview, did the interviews himself,

made the decision, and made no notes. *Id. at 147–149.*

The qualifications required for the job are also somewhat undefined. Since that discussion forms such a large part of the decision of the court, however, it will be left for below. Suffice it to say, when the evidence is viewed in favor of the Plaintiffs, confusion and arbitrariness reign there as well.

### 1994 forward.

The first chef, Cawley, stayed on the job at Ogden for about four years. He finally left around 1994, setting off a rapid succession of replacements who never quite worked out. In the intervals between replacements, Lane would resume her former duties—the duties that the chef had been undertaking. *Lane Depo. at 34.* These included her former duties, "such as the cooking, the hiring of employees, seeing that food goes out, doing grocery ordering, and getting it to Mr. Scheiben to order." *Id. at 34:18–22.* This resumption of her former duties came with no increase in pay. *Id. at 36.*

Even after Lane resumed the duties, Scheiben hired additional white chefs, however. Ms. Lane again felt that she was the victim of discrimination. *Lane Depo. at 39.* The second chef was a white male, who again was just a student at school. *Id. at 38.* Lane was told that the hiring was done because the new guy was a "chef." She never saw that any particular requirements of the white male were made because he was a "chef," however. The business maintained the "same menu" that it had "since the place opened up." Further, there just were no "changes whatsoever." *Id. at 37.*

The second chef was only there about a month. Again, when he left, Scheiben asked Lane to resume her former duties. *Id. at 39–40.* She resumed these duties for about a week, until a third white male was hired. *Id. at 40.* After he left, Lane again resumed the duties. A fourth white male was brought in, but he only lasted two days, before being fired. *Id. at 40–41.* The dates of hiring and firing for many of these chefs can become quite confusing. All of these chefs worked for Ogden within about a five month period, between November 1994 to March 1995. The final one was both hired, and fired, in March of 1995. *See Plaintiff's Response to S.J. at 21 (summarizing facts in light most favorable to Plaintiffs).*

A fifth white male, Jerry Adams, took the position in 1996. He was still there, at least on the date of Ms. Lane's deposition on April 27, 1998. *Id. at 41* He was a student in school when he began. *Id.* Ms. Lane testified that her job duties have changed since he took over—namely Adams gets "people to come in and do a lot of work that we used to do, such as make salads and desserts and all." *Id. at 41:21—42:6.* Again, she believes she has been denied a position to which she was properly entitled, by a person whom she states was less qualified. The Defendant contends, however, that Adams was better qualified, and bases much of its motion for summary judgment on that contention. The particular qualifications of Adams and Lane are discussed more fully below.

### Additional Contention.

Finally, the court must address at least one additional factual contention in this case. During the four years that Cawley, the first chef, was working for Ogden, Lane began to complain that her hours were being cut, and her work was being done by students from the local technical college. *Lane Depo. 29.* Following some complaints by Lane in 1992, Scheiben's supervisor at Ogden agreed to pay Lane and Farris a guaranteed 40 hours per week, plus overtime. Previously, they had only been paid for time actually worked.

Paying these employees a guaranteed 40 hours per week was stopped in January 1995, however. *Lane Depo. at 12:11–12.* This apparently occurred after a corporate audit discovered the practice, and ordered that it be stopped. Lane complained, and a supervisor paid her a visit regarding this in March of 1995. *Id. at 72–73.* Not even a conversation concerning this was held after April 1995, however. *Id. at 74.*

Apparently, the Plaintiffs could earn some additional hours with the company if they would agree to wash dishes. Dishwashers were hired in 1992, however, so that Lane and Farris would not have to cook and wash dishes, too. This was done at the direction of Scheiben's supervisor, Mr. Record. *Lane Depo. 64–65.* The only time after 1992 when Lane washed dishes was when Scheiben

brought his personal pots and pans from home for her and Ms. Farris to do. *Id. at 65–66.* Lane has filled out a form since Adams began duty requesting not to wash dishes. *Id. at 67–68.*

## III. DISCUSSION.

Discussion of summary judgment in this case requires more than just application of the usual shifting burdens analysis to the evidence. A number of interesting and even some unprecedented legal claims have been brought. The court begins by disposing of the claims of Ms. Farris. Then, the court moves through the claims of Ms. Lane, discussing a number of issues including the proper statute of limitations, whether there is a continuing violation, what claims are timely, and whether § 1981 may apply. Finally, the court concludes with application of the requirements of racial discrimination claims to the evidence that Ms. Lane has brought forth. This requires resolution, of course, of the motion to strike the affidavit of Ms. Lee.

The court finds that summary judgment is due to be GRANTED to the Defendant as to Ms. Farris' claims; that the motion to strike is due to be DENIED; and that summary judgment as to Ms. Lane's claims is due to be GRANTED IN PART and DENIED IN PART. Basically, the court finds that there is sufficient evidence to support the timely claims that she brings.

### Ms. Farris' claims.

■ As discussed above, Ms. Farris' claims are based on a rather odd theory. As stated in Plaintiff's summary judgment brief at 23:

Farris claims she should have been promoted to the Head Cook position once Lane was promoted to chef/chef trainee.

The basis of Ms. Lane's claims are that she never was promoted, but should have been promoted. Ms. Farris is claiming in effect that she would have (or at least should have) been promoted to a position, but for the fact that that position was never open. *See also Pretrial Order ("Farris is qualified for the position of Head Cook and would have received the position, if Lane was promoted.").*

On its face this is not an actionable claim. In order to establish a prima facie case in the hiring or promotion context, Farris must produce evidence that (1) she is a member of a protected group, (2) she applied for and was qualified for the job; (3) her application was rejected; and (4) the position was filled by a person outside the protected class who was only equally or less qualified. *Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir. 1998). All of this test, as well as the so-called "direct evidence" test, assumes that there is actually an opening to be filled. Ms. Farris' claim rests on an argument, however, that there *would* have been an opening if her co-worker had been promoted. Ms. Farris has presented the court with no legal authority to support this theory. Indeed, the court does not believe that one can be found. Summary judgment in favor of the Defendant on Ms. Farris' promotion claim is due to be GRANTED.

### Any other Claims?.

■ In their summary judgment brief, as well as at one of the depositions, Plaintiffs have stated that they are no longer pursuing a number of claims that they do not feel are supported by either the law or evidence. Plaintiffs have stated through their counsel that they are

no longer pursuing claims for sex discrimination, age discrimination, and any claims under § 1983. Plaintiffs' counsel agreed not to pursue these claims prior to any depositions being taken in this case. Plaintiffs are also not pursuing a retaliation claim. Thus, as stated above, Lane is pursuing a race claim under Title VII and § 1981 in regards to promotions, demotions and other terms, conditions, and privileges of employment; and Farris is pursuing a race claim under Title VII and § 1981 in regards to promotions, and other terms, conditions, and privileges of employment.

*Plaintiffs' Response to S.J. at 13 n. 7.*

The court is quite comfortable in analyzing the promotion / demotion claim of Ms. Lane, discussed below, and the promotion claim of Ms. Farris, disposed of above. The court is a bit unsure what Plaintiffs intend to claim relating to "other terms, conditions, and privileges of employment," however. There is really no argument in the briefs about any

claim other than Ms. Lane's promotion / demotion claim. The court can only glean—from the evidence presented—that Plaintiffs intend to pursue a claim relating to the time that they were no longer guaranteed 40 hours of pay per week.

This claim, assuming it is a claim, is due to be disposed of on summary judgment, however. No evidence has been presented that this violation occurred within any applicable limitations period. The adjustment was made in January 1995. That is more than two years prior to the filing of the complaint, so it cannot be actionable under § 1981. Further, it is more than 180 days before the filing of Plaintiffs' EEOC charge, so it cannot be actionable under Title VII. *See* discussion of statute of limitations periods below. If Plaintiffs' were intending to pursue any claim based on this change in their pay status, summary judgment is due to be GRANTED thereon.

The court understands that it has disposed of all claims relating to Ms. Farris, therefore, and will enter summary judgment in favor of the Defendant, and against her, in full. The remainder of this opinion will analyze Ms. Lane's claim that she was discriminated against with regard to promotions or demotions.

### *Statute of Limitations: What Period Should Apply to § 1981 actions?*

Before the court can decide whether Ms. Lane has a claim supported by the evidence, the court must decide whether Ms. Lane has a timely claim. She makes an argument regarding the statute of limitations for 42 U.S.C. § 1981 claims which is new before this court. It has been accepted by this court that the appropriate statute of limitations in a Section 1981 action is two years. *See Patterson v. Augat Wiring Systems, Inc.*, 944 F.Supp. 1509, 1518 (M.D.Ala. 1996). This is based on an application of the period of limitations for personal injury actions within the state, because there is no federal period of limitations for such actions. *Id.*

Plaintiffs argue, however, that the period of four years prescribed in 28 U.S.C. § 1658 should apply. Section 1658 was an act passed by Congress on December 1, 1990, that provides

Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues

The key part of this statute is, of course, "an Act of Congress enacted after the date of the enactment of this section." Plaintiffs are aware, and acknowledge, that § 1981 was passed originally as the Civil Rights Act of 1870. Plaintiffs' argument is, however, that amendments to § 1981, made through the Civil Rights Act of 1991, have in effect created a new civil action. This court, like several of those to confront this question before, simply does not buy this argument. Section 1981 was passed in 1870. Whether it was revised in 1991, indeed greatly expanded in 1991, will not bring it under the provision of 28 U.S.C. § 1658.

This court is persuaded in part by the opinion of Judge Kovachevich in *Jackson v. Motel 6 Multipurposes, Inc.*, 1997 WL 724429 (M.D.Fla.1997). There, she noted the confusion that was presented by the application of different state statutes of limitations to a federal cause of action. *Id.* at *2. Because of this, plaintiffs may be subject to a one year term in some states, but as long as a four year term in others. *Id.* at *1. Judge Kovachevich believes—perhaps rightly so—that there is a "need for a uniform statute of limitations for actions brought under § 1981." *Id.* at *2. She did not believe, however, that the need for federal uniformity should outweigh a rational interpretation of § 1658. *Id.* The simple truth is that § 1658 applies to

"an act of Congress enacted" after 1990, which of course, is entirely different from "an act of Congress amended" after 1990.

The state statute of limitations must continue to guide courts, until Congress undertakes to create something else. *Id.*

Judge Kovachevich was guided in her own reasoning by a decision from a district court in California. In *Davis v. State of Cal. Dept. of Corr.*, 1996 WL 271001 (E.D.Cal.1996), a court was confronted with the question of whether § 1658 alters the application of California's one year statute of limitations to

§ 1981 actions. The court rejected the application. While finding the language of § 1658 to be unclear, the court believed it would be better to take the interpretation that § 1658 applies only to acts adopted after 1990, and not acts amended after 1990. *Id.* at *19. The court in California did not take the application of § 1658 to § 1981 actions as an all-or-nothing proposition. Indeed, the court thought it obvious that a § 1981 action recognized before the 1991 amendments would not fit within the plain language of § 1658. *Id.* at *20.

The only question to the district court in California was whether claims that were viable only after the amendments were subject to the new statute of limitations. The court rejected the application of § 1658 even to these new causes of action, however. The court believed that it would simply be too confusing for a court to try to determine what parts of a claim were brought under the revision, and what parts were brought under the statute as originally written. *Id.* at *19–20. In those circumstances, the court decided to stick with the interpretation of § 1658 that emphasized its application to

"an act of Congress enacted" after 1990 as distinguishable from "an act of Congress amended" after 1990.

*Id.* at *19.

▋ This court, like the court in California, is convinced that § 1658 should not apply to any actions brought under § 1981, even those that result from the language of the act as interpreted by the Supreme Court, or those that result from the redefinition of the language of the act passed in the Civil Rights Act of 1991. This court is more inclined to agree with a decision from a third district to consider this issue, the District of Kansas. *Mason v. Anadarko Petro. Corp.,* 1998 WL 166562 (D.Kan.1998). There, the court was motivated by the simple truth that "all § 1981 claims arise under an Act of Congress enacted in 1870," an act whose language "has existed unchanged from its adoption to the present time." *Id.* at *5. The court, like the courts of Florida and California, discounted the importance of the amendments:

It is true that Congress expanded the scope of the right in 1991 by adopting a broader interpretation of the "make and enforce" clause [by interpreting it to mean the "performance and termination of contracts and the enjoyment of all terms and conditions of the contractual relationship"]. But the court agrees with Jackson that for purposes of § 1658 there is a distinction between an act "enacted" after 1990 and an amendment to an existing act after 1990. On the whole, the court considers the more persuasive view to be that § 1658 does not apply to claims arising under § 1981.

*Id.* at *5 (bracketed portion is from *4). This court is persuaded by the same argument as well.

The court would be remiss if it did not note that the decision to be made is at least somewhat unclear because of the test of the statute. Two decisions, in fact, have interpreted § 1658 to apply to acts amended after 1990. These include one from Kansas (before *Mason* ) that dealt with § 1981. In that decision, *Alexander v. Precision Machining, Inc.,* 990 F.Supp. 1304, 1308 (D.Kan.1997), the court held that § 1658 did apply to actions brought under the "new" section 1981, held that § 1658 should apply to a § 1981 "cause of action based on post-contract formation discriminatory conduct," which was the subject of Congress' 1991 amendments. *Id.*[1] In effect, § 1658 should apply to all new § 1981 actions, all of those that would not have been viable under the Supreme Court's interpretation in *Patterson.* This principle has also been stated in a decision dealing with the Federal Telecommunications Act. A district court in Illinois held that § 1658 should apply to actions under that act—even though it was originally passed in 1934— because it had been revised in 1996. *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.,* 1998 WL 156674 (N.D.Ill.1998).

The *MCI* decision relied heavily upon the reasoning of *Alexander.* Both focused on the perceived difficulty of deciding "when an

1. Congress passed the Civil Rights Act of 1991, largely to overrule a number of Supreme Court decisions. One of those decisions was *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which had held that "1981 applied only to discrimination in the formation of contracts." *Alexander,* 990 F.Supp. at 1308.

Act of Congress is not an Act of Congress." Basically, those courts did not want to have to decide when a statute was "new" or when there were merely revisions. Contrary to their stated reasoning, however, the standard employed by them does something very similar. Both courts relied upon the fact that the amendments which they addressed were "not merely technical in nature." *Alexander,* 990 F.Supp. at 1308; *MCI,* 1998 WL 156674 at *5.

■ This court finds the prospect of deciding when amendments are more than "merely technical in nature" as troubling as the prospect of deciding "when an Act of Congress is not an Act of Congress." The court believes the best way to avoid such difficulties is to hold that § 1658 applies only when there is an entirely new statute created by Congress. If Congress had meant for § 1658 to apply to amendments, they could have said so. Until Congress does say so, the settled expectations of the parties—that a two year statute of limitations applies—should not be disturbed. It was settled by the Supreme Court in 1987 that § 1981 actions should borrow the statute of limitations for personal injury in the state. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). That is two years in Alabama; and has been routinely recognized as applicable in § 1981 cases. At this point, the court considers the best policy to be stare decisis. Even if it is wrong, it will at least not upset expectations, and will not cause a variance among the district courts of this state. *See Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, dissenting) ("Stare decisis is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. This is commonly true, even where the error is a matter of serious concern, provided correction can be had by legislation.") A two-year period will apply to Plaintiff's § 1981 claim.

### Continuing Violation.

■ Plaintiff is not quite done with attempts to extend the statute of limitations in this case, however. She has also argued that the strict deadline of the statute of limitations for her § 1981 claim and for her Title VII claim should be ignored. Plaintiff wants the court to use the doctrine of a "continuing violation" to find that all of the refusals to promote Ms. Lane (and the consequent demotions), all the way back to 1990, are still actionable.

■ Plaintiff is correct that there are certain exceptions to the statute of limitations made in Title VII and § 1981 cases. These occur where there is a pattern of discrimination by the employer that can be accurately termed a "continuing violation." Where this doctrine applies, in certain circumstances, actions that took place outside of the statute of limitations may be included in the Plaintiffs' claims. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 449 (11th Cir.1993). To say that this analysis is available is not to say that it is appropriately applied in this case.

■ The "critical distinction in the continuing violation analysis" is whether the substance of the Plaintiffs' complaint results from

> the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does.

*Knight v. Columbus, Ga.,* 19 F.3d 579, 580–81 (11th Cir.1994). As explained by the Eleventh Circuit, stale claims may remain just that, even if there are some continuing consequences of the discriminatory act:

> Where the employer engaged in a discrete act of discrimination outside the limitations period, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the statute of limitations.

*Id.* at 580. A "discrete act of discrimination," indeed several "discrete act[s] of discrimination" are precisely what Plaintiff alleges in this case.

The court believes that this case fits squarely within the facts and law of *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793 (11th Cir.1988), modified 850 F.2d 1549 (11th Cir.1988). There, the plaintiff, a black man, was found to be discriminatorily denied a promotion in 1981. He had timely filed a Title VII claim on this incident; the Eleventh

Circuit affirmed a finding of liability; as well as an award of damages. 835 F.2d at 798–99.

The question most interesting for this court was whether the plaintiff could also claim that he was discriminatorily denied the same promotion in 1978. The Eleventh Circuit believed that the evidence "substantially support[ed] the District Court's finding of disparate treatment in the context" of this earlier incident. *Id.* at 799. Nevertheless, the court barred any recovery based on this earlier claim. The court's reasoning is particularly applicable here:

> [E]ven if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that [the plaintiff's] claim based on that incident is time-barred. [The plaintiff] admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that [the defendant] injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights. A claim arising out of an injury which is "continuing" only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180–day limitation period.

850 F.2d at 1550.

The evidence in this case clearly shows that Lane was aware—at least she believed—she had been discriminated against when each additional white male chef was brought in. She started complaining to Mr. Scheiben in 1990 that Cawley had taken her position. *Lane Depo. 27.* Further, she refers frequently to 1990 as the time when she first lost her supervisory duties. *Id. at 9:20—10:8.* Ms. Lane feels that the "good times" stopped then. *Id. at 21:5–12.* 1990 was "when Mr. Scheiben hired a white male and brought him in the kitchen and took my position, demoted me and took my position and give it to the white male." *Id.* Lane always thought that she should have gotten the job, when one of the white males was hired. *Id. at 42.*

█ Clearly, therefore, to the extent that Lane was injured by Ogden on any sort of continuing basis, "it was only because [s]he knowingly failed to exercise h[er] rights." *Roberts,* 850 F.2d at 1550. This court cannot

allow a claim to be considered as " 'continuing' only because [Lane] knowingly fail[ed] to seek relief." *Id.* To paraphrase *Roberts,* that is exactly the sorts of claims that statutes of limitations are meant to bar. *Id.* The "continuing violation doctrine does not exist to give an employee who allowed a legitimate claim to lapse a second chance to file that claim." *Lewis v. Board of Trustees of Alabama St. Univ.,* 874 F.Supp. 1299, 1303 (M.D.Ala.1995) (discussing *Roberts v. Gadsden Mem. Hosp.,* 835 F.2d 793, 800 (11th Cir.1988)).

█ Even if this court did not find that Ms. Lane's dilatory actions were the cause of the statute of limitations running in this case, the court would still find that the continuing violation theory should not apply to this action. The continuing violation theory is properly applied only where there is some continuing, re-occurring wrong that is the result of a continuously applied pattern of discrimination. A good example of this would be a discriminatory wage. As explained by the Supreme Court:

> Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII.

*See Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 797 (11th Cir.1992), quoting from *Bazemore v. Friday,* 478 U.S. 385, 395–96, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).

This case is simply much more like a few individual, independent decisions, than it is a violation that is reenacted with each Friday's paycheck. There were a number of "single discriminatory act[s]" which occurred outside of the limitations period. *Beavers,* 975 F.2d at 798. The decisions not to promote Ms. Lane are not the sort of "series-of-related-acts" where it would not become apparent to the employee that she was being discriminated against until a pattern arose. *See Beasley v. Alabama St. Univ.,* 966 F.Supp. 1117, 1129 (M.D.Ala.1997) (Thompson, J.). Application of this version of the continuing violation theory is most appropriately applicable to hostile work environment claims, where the claim at issue

is not based on discrete acts, but is based on an ongoing pattern of offensive conduct. *See, e.g., Patterson,* 944 F.Supp. at 1517 (applying continuing violation analysis to hostile work environment claim); *Quillen v. American Tobacco Co.,* 874 F.Supp. 1285, 1292 (M.D.Ala.1995) (same); *Saville v. Houston County Healthcare Auth.,* 852 F.Supp. 1512, 1522 (M.D.Ala.1994) (same). That type of claim is not present here.

Further, this court is somewhat confused by the Plaintiffs' invocation of the so-called "systematic policy of discrimination" prong of the continuing violation test. This prong is discussed by Judge Thompson in two decisions in *Beasley v. Alabama St. Univ.,* 966 F.Supp. 1117 (denying motion to dismiss filed by defendant on this theory), 1998 WL 229916 (granting motion for summary judgment to defendants). As Judge Thompson points out, the purpose of this theory is to allow Plaintiffs to challenge a policy—or "standard operating procedure" of discrimination—that has been continued into the present. 1998 WL 229916 at *4. As he put it

> If the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute of limitations does not foreclose an action aimed at enforcement of the policy during the limitations period.

*Id.* This court does not understand the Plaintiffs to be invoking the continuing violation mantra so that they will be allowed to pursue "an action aimed at enforcement of [a discriminatory] policy during the limitations period." Rather, Ms. Lane is invoking this theory to claim that there is a policy, and she may pursue an action for enforcement of this policy both within and without the limitations period. This is a creative argument, but is not to be allowed.

The most applicable precedent in this case is that of *Roberts.* An employee should not be allowed to pursue a stale claim of failure to promote her, where she believed that she had been wronged at the time of the failure to promote, and failed to act. Each failure to promote her was a separate and distinct act, and should be analyzed as such. *See Barrett v. Florida Power & Light Co., 1987 WL 16438,* 1987 U.S. Dist. LEXIS 13713 (S.D.Fla.1987) (finding that each denial of promotion was separate, thereby precluding application of continuing violation theory);

*see also Soble v. University of Md.,* 572 F.Supp. 1509, 1515–16 (D.Md.1983) (treating denials of a promotion as separate and distinct events). Neither the facts of this case, nor the law, support Plaintiff's invocation of the continuing violation theory.

### At–Will Employment Issue.

 Before the court moves on to analysis of Lane's timely claim, the court must deal with one additional legal issue. Defendant has asserted that Plaintiff cannot bring a § 1981 claim in this case because she is an at-will employee. This argument is based on a theory that at-will employees have no contract; hence, they have no rights under § 1981, which applies to contracts. Courts in at least two districts have adopted this theory. *See Moorer v. Grumman Aerospace Corp.,* 964 F.Supp. 665 (E.D.N.Y.1997); *Moscowitz v. Brown,* 850 F.Supp. 1185 (S.D.N.Y. 1994); *see also Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1029–31 (7th Cir.1998).

Despite the holdings of these other courts, this district court considers this argument to be without merit. The court believes that Defendant has confused the issue of whether the employee has a "contract" in the sense used in labor law—i.e., employment for an agreed duration, with certain benefits and protections—with the issue of whether there is a contract between an employer and an at-will employee at all. Even at-will employees have some sort of contract, in the broader legal sense of that term, with their employer. Even though the at-will employee could not file a breach of contract claim for being fired (since he has no protections), the at-will employee would be able to file a breach of contract claim if, for example, he was not paid the correct amount. "Contract" is used in § 1981 in its basic legal meaning, not a specialized labor law meaning. This argument is, therefore, without merit.

### Actionable Violations.

 Without a claim for "continuing violation," the Plaintiff is left with only claims which are properly brought within the statute of limitations. Plaintiff will not have a Title VII claim for any of the actions that occurred before she filed her EEOC charge on January 12, 1996. No promotion / demo-

tion was suffered in the 180 days prior to the filing of that charge. Plaintiff will have a Title VII claim for promotion / demotion she suffered when Jerry Adams was brought in as chef, later in 1996. Defendant has not contested this issue. If it had, however, the court would find that this promotion / demotion claim would reasonably grow out of Lane's Title VII charge, and therefore, be actionable in the complaint. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.1994) ("A Plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."), relying on *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970) (Title VII complaint may encompass discrimination *like or related to* allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission).

Plaintiff's § 1981 claim exactly overlaps with the Title VII claim. Plaintiff will have a § 1981 claim for the times that she was denied a promotion within two years of the filing of this lawsuit. The complaint was filed on May 27, 1997. Therefore, actions occurring after May 27, 1995, can be actionable as § 1981 claims. This period includes only the hiring of Jerry Adams in 1996. The chef before Adams was Kevin Turnbull, who was employed in March 1995. *See Plaintiff's Response to S.J. at 21 (viewing evidence in light most favorable to Plaintiffs and concluding that Turnbull was employed in March 1995).*

Ms. Lane's only timely claim, therefore, is a claim for the time that Jerry Adams was hired as a chef, and she was not promoted to the position. Her "demotion claim" is actually the same claim, differently stated. At the time she was not promoted, but Adams was hired, she suffered the loss of the duties that she was exercising. Adams' hiring did not follow directly on the heels of the firing of the previous chef. Therefore, there is a period of time in which Lane had re-assumed her former duties, as discussed in the facts section above. The court will now turn its attention to whether this timely claim, is supported by the evidence.

### Motion to Strike Affidavit of Annice Lee.

Before the court can fully discuss the evidence, however, it must decide what to do with one affidavit submitted by Plaintiff. Defendant has moved to strike an affidavit executed by Annice Lee, a former employee of the Defendant. She served as an assistant manager to Mr. Scheiben at Ogden, and makes a number of allegations concerning past racial discrimination by Scheiben.

Defendant claims that this affidavit is due to be stricken because the Plaintiff intentionally withheld the evidence. This motion is due to be DENIED. Plaintiff continually furnished the name of Ms. Lee to Defendants on required disclosures. She was disclosed as someone with personal knowledge on the initial disclosure of August 20, 1997. She was also disclosed, along with her address, on a disclosure on November 13, 1997. Further, the Plaintiff furnished a copy of her affidavit one business day after it was received by their counsel. These actions comply with the court's scheduling order, as well as the Federal Rules of Civil Procedure.

Defendant's complaint is based on an assumption that the Plaintiff, or her counsel, had specific notice of Ms. Lee's knowledge of certain facts at the time that Plaintiff responded to interrogatories, but did not disclose this knowledge. This is based on the fact that Ms. Lee's affidavit was apparently the first evidence furnished by Plaintiff that substantiated an allegation in the complaint (the allegation that Mr. Scheiben used the racial slur "porch monkey"). Although this certainly raises some sort of cautionary flag, the court does not believe that this allegation of Defendant is sufficient to strike the affidavit. It is only an insinuation of dishonesty and does not show that Plaintiff has not complied with her responsibility to "disclose what information [she possessed] at the time [she] respond[ed] to the interrogatories." *Shearson Lehman Hutton, Inc. v. Lambros,* 135 F.R.D. 195, 198–99 (M.D.Fla.1990).

Plaintiff's attorney represents to the court that all information was furnished when it was first made available, and that he has complied with the duty to supplement his discovery responses. The court will accept these representations of counsel. Plaintiff's

counsel is experienced, and aware of his duties under the Alabama Rules of Professional Conduct. *See* Ala. R. Pro. Conduct 3.3. (Candor Toward the Tribunal). Further, he is aware of his duties under the Rules of Civil Procedure, local rules, and orders of the court.

The Defendant was furnished with the name of this witness early on in these proceedings. Defendant could have sought to interview or depose this witness itself, or to discover her knowledge through other sources. Ms. Lee was, after all, the secretary to Mr. Scheiben, and a former employee of the Defendant. Further, Defendant was furnished with this affidavit as soon as it became available. The court finds no abuse in Plaintiff's actions, certainly no abuse sufficient to justify striking this affidavit under Rules 16(f) or 37(c). Defendant's motion to strike the affidavit of Annice Lee is, therefore, due to be DENIED.

### Ms. Lane's Surviving Claim.

With all limitations issues, and other preliminary issues, out of the way, the court may now consider whether Plaintiff's timely claim can survive summary judgment. In analyzing the evidence in support of this claim, the court may consider the issues of Title VII and § 1981 together. While Title VII's remedial provisions are inapplicable to § 1981 claims, the Eleventh Circuit has held that the same substantive analysis applies to race discrimination cases under Title VII as those under § 1981. *Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1060 (11th Cir.1994).

Title VII and § 1981 plaintiffs may prove their race discrimination claims in either of two ways. This may be done either through the production of "direct evidence" of discrimination, or through the production of "circumstantial evidence" of discrimination. In this case, Plaintiff has advanced both, so both should be considered.

### Direct Evidence.

█ Direct evidence is evidence that, if believed, proves the existence of discrimination "without inference or presumption." *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir.1998). Such evidence must truly be focused on the employment action at issue. Not only must it be evidence of discriminatory "actions or statements of an employer," but the actions or statements at issue must "correlat[e] to the discrimination or retaliation complained of by the employee." *Id.* Further, the statements "must be made by a person involved in the challenged decision," *Trotter v. Board of Trustees of Univ. of Alabama,* 91 F.3d 1449, 1453–54 (11th Cir.1996), and must not be subject to varying reasonable interpretations, *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189–90 (11th Cir.1997). Examples of direct evidence would consist of a statement by a "plant manager that he wouldn't hire blacks because 'half of them weren't worth a s[* * *],'" *id.* (discussing *Miles v. M.N.C. Corp.,* 750 F.2d 867, 876 (11th Cir.1985)), or a "production manager's statements to [a] black employee that 'you people can't do a ———— thing right," *Carter,* 132 F.3d at 641 (discussing *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990)).

The presentation of direct evidence is somewhat of a nuclear bomb at the summary judgment stage. "Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt,* 120 F.3d at 1189; *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996). Further, when the matter does get to trial, the burden of proof shifts to the defendant to prove by a preponderance of the evidence that they would have made the same employment decision even if they had not used the proscribed criteria. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

█ First, Ms. Lee's affidavit presents a wealth of evidence of racial discrimination by Mr. Scheiben. Those parts of her affidavit which do not relate directly to this hiring decision are not direct evidence, however. These include evidence of racial slurs—"jungle bunny" and "porch monkey"—that Scheiben allegedly used on numerous instances. It also includes his alleged statement that black people "breed like rabbits, before you know it, they are all related," and evidence that Scheiben criticized black people for what he perceived to be hygenic deficiencies, and stupidity. Further, evidence that Scheiben

once instructed Lee to hire white waiters, at an above-normal wage, because he was tired of black wait staff "coming in there and smelling bad with gold in their teeth and hair and wearing bedroom slippers," does not relate to the chef position so it cannot·be termed direct evidence.

▮ Next, however, Ms. Lee does offer some evidence which comes closer to the direct evidence line. She testified that Scheiben told her that he did not want Ms. Lane to be chef. Because Ms. Lee does not state if Scheiben told her why he said this, it cannot be termed direct evidence. He may have said that—if he said it at all—for perfectly legitimate reasons. Further, Lee offers evidence that she once overheard Scheiben instruct his secretary to falsely tell a black man applicant for chef that the position was filled, so that he would not have to interview the man. Again, since Ms. Lee does not offer that Scheiben stated this was for racial reasons, the court cannot properly consider it to be direct evidence.

Plaintiff, however, does not lose at summary judgment just because she has not offered what might properly be termed as direct evidence of discrimination. Plaintiff's claim survives nonetheless. She has built a sufficient case based on circumstantial evidence.

### Circumstantial Evidence.

When a plaintiff bases her case on circumstantial evidence, the so-called shifting burden analysis of *McDonnell Douglas* and its progeny is used. The shifting burden analysis requires a plaintiff to first come forward with evidence sufficient to establish a prima facie case of discrimination. If this ·rather low burden is satisfied, the Defendant is then called upon to satisfy an even lower burden of articulating a legitimate, nondiscriminatory reason for its allegedly discriminatory decision. The production of this reason serves to shift the burden back to the Plaintiff, who then must produce evidence of "pretext," i.e. evidence that tends to disprove the Defendant's asserted reasons. *See Carter,* 132 F.3d at 642–43 (laying out shifting burden analysis). The court now shifts its attention to those three steps.

### The Prima Facie Case.

▮ In order to establish a prima facie case in the hiring or promotion context, Lane must produce evidence that (1) she is a member of a protected group; (2) she applied for and was qualified for the job; (3) her application was rejected; and (4) the position was filled by a person outside the protected class who was only equally or less qualified. *Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir.1998).

Defendant's discussion of Lane's ability to meet the prima facie case on the denial of her promotion is somewhat confusing. Defendant does not challenge—indeed, the court has not seen any evidence or argument to dispute—that Lane was black, that she did not receive the position, and that the chef actually hired was white. Further, Defendant apparently raises no dispute over whether she applied for the job. That dispute would be unsuccessful in any event. Defendant apparently used no formal posting system, so it had a duty to consider all of those who might have been interested. Further, the job itself was never posted. *Lane Depo. at 69.* Further, Defendant had a duty to consider Lane since she had expressed an interest in the job before (indeed, she had complained that she had not received it). Indeed, Scheiben himself not only claims she applied, he insists that he offered the job to her. ˙Evidence is sufficient to show, therefore, that the "applied for" prong either drops out or is met. *See Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 533 (11th Cir.1992).

Defendant primarily spends it efforts arguing that Lane was not qualified for the position of chef. Defendant argues both that (1) Plaintiff cannot satisfy her prima facie case because she is not qualified, and that (2) Defendant's legitimate, non-discriminatory reason for not hiring Lane was that she was less qualified than the other applicants. Because the questions of qualifications overlap in this case, the court will consider them together.

### Qualifications & Pretext.

▮ Consistent with long-standing precedent that plaintiff's prima facie burden is not an onerous one, the Eleventh Circuit has

held that the third element of the prima facie case—that plaintiff be qualified for the position—means that plaintiff satisfies the *minimum* qualifications of the job. *Carter,* 132 F.3d at 642. Consequently, to satisfy the prima facie test, a plaintiff need not prove that she was the *most* qualified, but simply that she was at least minimally qualified to perform the position in light of her background.

In Defendant's evidence, Scheiben testified that he "repeatedly asked Ms. Lane if she would like to have or learn or adopt or attend a school to acquire the position as the location chef," but Lane told him that "she did not want the responsibilities and that we could work her long hours and wouldn't pay overtime." *Scheiben Depo. at 104.* He thought that he had asked her this four or five times over the years. *Id. at 105.* He offered her the position, even though he believed she was not qualified, because he "would have been willing to work with her and help her develop the additional skills required to be a chef." *Id. at 110.*[2] He would have hired her if she accepted the position. *Id. at 112.*

With Defendant's evidence alone, therefore, Plaintiff has probably met her prima facie burden of showing that she is minimally qualified for the job of chef. She was offered the job. That alone should be enough. Defendant insists, however, that there were stated qualifications for the job that she did not meet. At this point, the question of whether Lane was qualified, for purposes of the prima facie case, begins to merge with the question of whether she was less qualified than Adams.

■ In presenting evidence that sufficiently disputes Defendant's argument that Jerry Adams was better qualified, Plaintiff must meet a higher burden than that of the prima facie case. Where the Defendant raises the issue that the Plaintiff is less qualified than the person who actually received the job, the Plaintiff must present "evidence sufficient to permit a reasonable factfinder to disbelieve [the defendant's] proffered nondiscriminatory explanation[s]." *Combs v.*

*Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997). This may consist of demonstrations of any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a "reasonable factfinder could find them unworthy of credence." *Id.* at 1538. When such evidence of pretext is presented, summary judgment is due to be denied. It then becomes the jury's function to determine whether the inference of discrimination created by the prima facie case, in conjunction with the evidence questioning the defendant's purported reasons, is enough to prove intentional discrimination. *Id.*

■ The reason that the court considers the "qualified" prong of the prima facie case, and the pretext weighing of qualifications, together in this case is really a very simple one. Much of the Plaintiff's evidence of discrimination is that the Defendant was both arbitrary, and vague, about the qualifications required for the job. To some degree, therefore, the court cannot fully determine whether Lane is qualified, because the court does not know what the qualifications were. Further, the court cannot determine whether the comparator was more qualified, given that there is uncertainty as to what qualifications Ogden was looking for. The same evidence serves both to prove that she was qualified, and to question the alleged better qualifications of Adams. *See Arrington,* 139 F.3d at 875 n .20 ("A plaintiff may rely on the same evidence both to establish her prima facie case and to cast doubt on the defendant's nondiscriminatory explanations"); *see also Carter,* 132 F.3d at 643–45 (conflating qualified step with pretext step). In this case, Plaintiff has presented sufficient evidence which serves to show that the Defendant's asserted reason is pretextual. She may carry her claim, therefore, to a jury.

First, pretext may be shown because the qualifications for chef are never written, but instead were created by Mr. Scheiben. *Scheiben Depo. at 149:20—150:10.* This factor alone is enough to give the Defendant

---

**2.** The fact that Lane needed training would not serve to eliminate her as qualified. Chefs who were hired needed training too. *Id. at 178:8–10.* Some of the chefs even worked together in a

"joint effort" with Ms. Lane for about a year, before taking over all of the coordinating in the kitchen. *Id. at 181–82.*

some problem on summary judgment. The Eleventh Circuit has held that "the failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination." *Carter*, 132 F.3d at 644. Where criteria are unwritten, the Eleventh Circuit has instructed that "greater scrutiny" should apply. *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994). Applying greater scrutiny here, leads to an inevitable inference of pretext.

█ Second, pretext is also presented where the qualifications for the job are the result of subjective analysis. The evidence supports that subjectivity was perhaps the only basis for the decision here. Mr. Scheiben based the requirements only on qualifications he thought were "understood in the industry." *Scheiben Depo. at 150:4–16*. His evaluation was done solely from "[his] experience as an executive in the industry." *Id.* Requirements were not sent from Ogden, or any central authority. Further, the process of hiring the chef was one controlled completely by Scheiben. Scheiben decided who to interview, did the interviews himself, and made no notes. *Id. at 147–149*. Where subjectivity on the part of differently-raced supervisors is the basis of job requirements, the Eleventh Circuit has recognized that there is a "ready mechanism for racial discrimination." *Carter*, 132 F.3d at 644. While nothing is inherently wrong with subjective criteria, such criteria "cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion." *Id.* Here, the subjectivity of the process also creates an inference of pretext.

Third, pretext is created in this case because of the contradictory and vague statements of the particular qualifications for the job. The qualifications for the job are contradictorily defined even by Mr. Scheiben himself. For example, he states in an affidavit filed after his deposition that

> Ogden chefs and chef trainees are required to have a high school diploma or equivalent degree. In addition, Ogden attempts to fill these positions with individuals who have pursued specialized training in culinary arts or the food industry. Furthermore, Ogden recruits clients who have prior managerial and/or administrative experience.

*Scheiben Affid. at para. 15.*[3]

It is apparent just from reading Scheiben's affidavit that specialized culinary / food industry training, and managerial experience are not "requirements." Rather, Ogden "attempts" to get someone with specialized culinary training, and "recruits" for management experience. Those statements are far from saying that Ogden requires such qualifications.

In any event, even if the court does view his affidavit as stating required qualifications, pretext would be created by his contradictory testimony at his deposition, and contradictory qualifications of those actually hired. In his deposition at 173:9–17, Scheiben, in response to clear questions indicated that a high school diploma was not required:

> Q. Okay. Is that a requirement flat out that person has to have a high school—
>
> A. No.
>
> Q. Okay. So that's not—if a person doesn't have a high school diploma but has other qualities, you would still hire the person?
>
> A. Probably.

*Scheiben Depo. at 173:9–17*. Further, Scheiben also testified that culinary training was not neccesarily required, *Scheiben Depo. at 170–171*, but that experience in similar "large volume catering" or a related field would suffice, *Scheiben Depo. at 172* . Pretext is again created, therefore, by the inconsistency that occurs even when the single general manager attempts to define the job requirements for chef.

Fourth, pretext may also be shown in this case because of the failure of Defendant to follow the rules which it at times claims that it has. As stated by the Eleventh Circuit, it is "suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring

**3.** Here, Scheiben has conflated the positions of chef and chef trainee. Both sides have done this throughout their briefs as well. Apparently, Ogden considered the position to be interchangeable. Only one person ever filled the position at one time. The court will discuss the evidence, therefore, as if there is only one position.

process." *Id.* If the court were to assume that the qualifications stated by Scheiben were indeed real qualifications, the Plaintiff has shown that they were not respected. For example, when Cawley was hired, he was not a chef and had no experience in a banquet type environment. He had been a manager at McDonalds, and a line cook at another restaurant. *Cawley Application; see also Lane Depo. at 26.* Also, Brewer had only been a kitchen supervisor at a restaurant, and was only a chef's apprentice himself. *Brewer App; Lane Depo. at 39.* Even if Defendant had strict qualifications, therefore, pretext would have been shown by its ignoring of those qualifications.

Fifth and finally, pretext may also be created when the qualifications of Adams are directly compared with those of Ms. Lane. Adams apparently had no experience judging from his application for employment. Further, his degree was an "Associate in Arts" from a college in Maryland, and not a degree in business or management. He was also a student in school at the time that he took the job. *Lane Depo. at 41.* Granted, there is some evidence that Adams was a superior candidate. For example, Scheiben testified that Adams had worked in Europe, and had a four-point grade average in school. *Scheiben Depo. at 207–08.* Given this, Adams may have been the superior candidate to operate a computer, and to undertake duties such as "all cost control and analysis." *See Scheiben Depo. 53:9–22.* This would seem especially true since Ms. Lane never graduated from high school. Nevertheless, at this stage of the proceedings, the court must view the evidence in the light most favorable to Plaintiff. Viewing the evidence in that light, there certainly could be a jury question as to whether Ms. Lane's 35 years of experience (including 20 + years with Ogden) outweigh those of a student with no experience.

### Summary of Title VII / § 1981 Claim.

In sum, Plaintiff has presented at least five lines of evidence which call into doubt the Defendant's asserted legitimate reason for preferring Adams over her. Even if Plaintiff had not satisfied her burden by persuading the court indirectly that the reason for preferring Adams was not racial, she could have satisfied the court with the other evidence of Annice Lee. Although that evidence did not amount to direct evidence of racial discrimination in the preferral of Adams, it serves to bolster Ms. Lane's case, and create a question of fact as to whether she was discriminated against. *Combs,* 106 F.3d at 1528; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

### IV. CONCLUSION.

Delois Lane's case will survive summary judgment, therefore, as to one claim. She can go to a jury on the question of whether she was discriminated against on the basis of race when she was not promoted to chef in 1996, instead of the hiring of Jerry Adams. This claim will, of course, necessarily entail that she was "demoted" at the same time. The evidence shows that before Adams was brought in, Lane had resumed her former, greater duties. *Lane Depo. at 41.* The demotion claim is, therefore, to a great degree the same thing as the failure to promote claim.

This court "emphasize[s]," as has the Eleventh Circuit in the past, that its decision does not mean that Lane has proven her case. *Carter,* 132 F.3d at 645. A reasonable jury may very well believe that Lane was not qualified, or that Adams was better qualified. Further, the jury may even believe that Lane never even wanted the job (an issue that was not a focus of Defendant's arguments for summary judgment).

Plaintiff has only shown that a genuine issue of material fact exists with regard to the Defendant's decision to hire Adams. Plaintiff's burden to win at trial will be much greater. There, she will have to prove that the "real reason for the employer's decision was intentional racial discrimination." *Howard,* 32 F.3d at 525 (discussing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)). She will, however, have that opportunity.

A separate order will be entered.

### ORDER

In accordance with the memorandum opinion issued on this day,

1. Defendant's motion to strike the affidavit of Annice Lee is DENIED.

2. Summary judgment is DENIED to the extent that Ms. Delois Lane will be allowed to continue with a claim that she was discriminated against because of her race when Jerry Adams was hired by Ogden in 1996. This will be a claim for wrongful failure to promote / demotion, and will be allowed under Title VII, and 42 U.S.C. § 1981.

3. Summary judgment is GRANTED as to all other claims by Ms. Lane, and as to all claims by Ms. Farris.

4. Judgment is entered in favor of the Defendant, Ogden Entertainment, Inc., and against the Plaintiff, Ida Mae Farris.